80 Ill. App.3d 41 (1979)
399 N.E.2d 212
In re CUSTODY OF TIM RUSSELL.  (FREDRICK RUSSELL, Petitioner-Appellee,
v.
BELLE RUSSELL KELLUM, Respondent-Appellant.)
No. 79-166.
Illinois Appellate Court  Fifth District.
Opinion filed December 21, 1979.
*42 James A. Schraidt and Philip C. Milsk, both of Land of Lincoln Legal Assistance Foundation, Inc., of Carbondale, for appellant.
No brief filed for appellee.
Judgment affirmed.
Mr. JUSTICE KARNS delivered the opinion of the court:
Belle Russell Kellum and Fredrick Russell were divorced in November 1976 by decree of the Circuit Court of Williamson County. Belle was awarded custody of the couple's minor child, Tim, born May 9, 1974, subject to Fred's right of reasonable visitation.
In April 1978, Fred filed a petition for temporary custody of Tim, alleging that circumstances in Belle's household and Belle's emotional problems were detrimental to Tim's health and welfare. Both parties had remarried, and a son, Rudy, had been born to Belle and her second husband, Donnell Kellum. Fred's petition was heard in February 1979, at which time it was agreed that permanent rather than temporary custody was at issue. In aid of its determination, the court appointed counsel to represent Tim's interests, pursuant to section 506 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 506) and ordered an investigation and report by the Department of Children and Family Services as provided in section 605 of the Act (Ill. Rev. Stat. 1977, ch. 40, par. 605). Counsel for Tim participated fully in the proceedings, and the caseworker from the Department who conducted the investigation testified at trial. The court awarded custody to Fred, and this appeal followed.
The Illinois Marriage and Dissolution of Marriage Act provides that upon dissolution, custody shall be determined according to the best interests of the child. (Ill. Rev. Stat. 1977, ch. 40, par. 602.) Custody may not be modified unless the court finds that a change has occurred in the circumstances of the child or his custodian and that modification is necessary to serve the best interests of the child. (Ill. Rev. Stat. 1977, ch. 40, par. 610(b).) The original custodian shall be retained "unless * * * the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him." (Ill. Rev. Stat. 1977, ch. 40, par. 610(b).) The trial court concluded that circumstances in Belle's environment seriously endangered Tim's mental and emotional well-being and that a change of custody was in Tim's best interests.
It is uncontroverted that Belle changed residences with Tim and Rudy at least six times in the two years since her divorce from Fred and five times in the four months preceding the hearing. Some of the moves involved brief periods of time in the homes of relatives. Two weeks before the hearing Belle and her sons moved into a four-room garage apartment rented by her father. The apartment was on the second story *43 and consisted of two bedrooms, a kitchen and a living room. Belle's father occupied the apartment on a part-time basis during layovers in his seasonal truck-driving job. He and the boys shared one of the bedrooms, and Belle slept in the other.
Belle testified that she loved Tim, that she wanted custody of him, and that she thought it would be difficult for him to be separated from his half-brother. Belle plans to seek evening employment or attend night school and to leave the children with her brother and sister-in-law while she is away. These arrangements would involve driving the children nightly from Herrin, where Belle now resides, to Marion, where her brother and sister-in-law live. The plans are further complicated by the physical handicaps of the brother and his wife, who both have cerebral palsy. Belle asserted that her brother can walk "pretty good," but his wife requires the assistance of a walker. Belle does not regard these conditions as obstacles to child care. Belle's present income is approximately $300 a month from child-support payments by Fred and Donnell, supplemented by occasional contributions from her father.
Donnell testified that he loved Tim and was willing to adopt him. He and Belle both testified that after Tim returned from visits with the Russells, he would regress in his toilet habits and act moody and upset. Both also agreed that Tim and Rudy were very close and got along well with each other.
Belle and Donnell separated a month before the hearing. They each testified that reconciliation was possible, though uncertain, and that many of their marital difficulties arose from tensions surrounding this case. There were several incidents of physical violence between Belle and Donnell. Belle was hospitalized overnight following one argument. If reconciliation were effected, there was some indication that they would move to Chicago.
Fred Russell, his current wife, Sondra, and his mother all testified that Tim enjoyed himself during his weekend visits to the Russell home and objected to leaving when it was time to return to Belle's. Fred and Sondra both stated that they loved Tim. Each of them also observed teeth marks on Tim's scalp and bruises on his back when he came to visit them, but Belle and Donnell both denied inflicting excessive punishment on Tim, and there was no direct evidence of child abuse. Fred and Sondra live in a five-room home with Sondra's two children by her prior marriage. When Tim is visiting, he and Sondra's son share one of the bedrooms. Sondra is not employed and is home to care for the children. She and Fred both testified that their marriage is stable and that Tim and Sondra's son get along well with each other. Fred earns $150 per week as a barber. A judgment of $2,238.36 has been entered against Fred and Sondra on a bank loan.
Following her divorce from Fred, Belle sought counselling at the Franklin-Williamson County Mental Health Center. On the advice of her counsellor, Belle was hospitalized for four days in February 1978 to *44 recuperate from emotional strain. Belle's counselor, Barbara Young, testified that Belle is now able to cope on her own with stress and can provide love and emotional support for Tim.
Peggy Demeretti, an employee of the Department of Children and Family Services who conducted the Department's investigation, interviewed Belle and Fred and visited their respective homes. (At the time of her visit to Belle, Belle had not yet moved into the garage apartment and was staying with relatives.) She testified that the absence of a permanent residence and general instability in Belle's home were negative factors for Tim and recommended that in Tim's best interests, custody be transferred to Fred. She also mentioned that Tim could be adversely affected by social pressures as he grew older because of the interracial character of Belle's marriage to Donnell, who is black. When Mrs. Demeretti talked with Tim, he did not express a preference between his parents and told her he was equally happy with either of them.
David Matthews, a child psychologist at the Franklin-Williamson County Mental Health Center, gave Tim psychological tests in June 1979. He reported that Tim had normal intelligence and coordination and a good attention span. Tim's tests revealed strong positive feelings for his mother, which Matthews stated was a normal condition for boys Tim's age. Matthews did not make a custody recommendation.
Based on the testimony, the court concluded that material changes in circumstances had occurred since the initial custody order, that Tim's present environment endangered his mental and emotional health, and that a change in custody was in his best interests. The court based its determination on eight factors which were read into the record with great detail indicating the court's thoughtful consideration of the facts before it, namely, the lack of a stable and permanent home with Belle; the lack of stability in Belle and Donnell's marriage; Belle's emotional condition; Demeretti's testimony that Fred's home was more stable than Belle's; the potential social problems arising from the interracial marriage, as compounded by the instability of the marriage; the vagueness and inadequacy of Belle's projected child-care plans; and the comparative stability of Fred's home and marriage. The record indicates that the court's crucial concerns were the lack of stability in Tim's present home environment and the unsatisfactory child-care arrangements that Belle projected.
 1 Stability of environment is an important factor in determining a child's best interests. (DeFranco v. DeFranco (1978), 67 Ill. App.3d 760, 771, 384 N.E.2d 997, 1005; Cave v. Cave (1971), 2 Ill. App.3d 782, 276 N.E.2d 793.) In DeFranco, one of the reasons that custody was taken from the mother was that subsequent to her divorce, she lived at three different residences, causing the children to attempt to readjust continually to new environments. *45 In Holloway v. Holloway (1973), 10 Ill. App.3d 662, 294 N.E.2d 759, custody was transferred from a mother who had moved three times in two years and left her child with babysitters much of the time. In the present case, the mother moved at least five times in four months and her marital status and child-care plans were unsettled. The reasons advanced by her to justify the moves; unfriendly neighbors, high heating bills, and cramped quarters, do not negate their destabilizing effect.
Belle argues that the court's recognition of racial factors in reaching its decision will have an unconstitutionally chilling effect on the fundamental right of marriage, because in hopes of regaining Tim's custody she will feel compelled to divorce Donnell and associate with white males only. Belle's brief concedes that this argument is speculative, and our consideration of the record convinces us that the court assigned little weight to considerations of race.
 2 We have no doubt, after reviewing the record, that the court took into consideration all relevant factors and did not allow the matter of race alone to overweigh all other considerations and did not regard the racial factor as decisive. (Langin v. Langin (1971), 2 Ill. App.3d 544, 276 N.E.2d 822; Stingley v. Wesch (1966), 77 Ill. App.2d 472, 222 N.E.2d 505; Annot., 57 A.L.R.2d 678 (1958).) Instead, the court simply acknowledged that social pressures could develop that would be difficult or detrimental for Tim. This consideration, however, was not the foundation for the court's decision and accordingly is not grounds for reversal.
 3, 4 The trial court had an opportunity to observe the demeanor and credibility of the witness and was in a unique position to assess those factors. Its decision is presumptively correct. (Mason v. Mason (1977), 49 Ill. App.3d 775, 779, 364 N.E.2d 705, 708.) Once a trial court makes a decision as to change of custody, that decision will be disturbed only if it is contrary to the manifest weight of the evidence or constitutes an abuse of discretion. Rippon v. Rippon (1978), 64 Ill. App.3d 465, 381 N.E.2d 70, 73.
 5 Belle's frequent changes in residence, the instability of her present marriage, and the uncertainty of her vocational and child care plans are facts that arose since the prior judgment which constitute a change in circumstances warranting modification of custody. We cannot say that the court's determination was contrary to the manifest weight of the evidence or was an abuse of discretion.
For these reasons, the judgment of the Circuit Court of Williamson County is affirmed.
Affirmed.
JONES, P.J., and KASSERMAN, J., concur.