*In re* MARRIAGE OF DIANE MARIE PADIAK, a/k/a Diane Marie Pope, Petitioner-Appellant, and JOSEPH PADIAK, Respondent-Appellee.

Second District    No. 81-11

Opinion filed November 3, 1981.

Peter M. Donat, of Donat and Donat, of Batavia, for appellant.

Linda Sue Kegan and Howard W. Broecker, both of Geneva, for appellee.

Mr. JUSTICE REINHARD delivered the opinion of the court:
This appeal arises from a judgment modifying the custody of Gwendolyn Padiak, who was seven years old at the time of the hearing, from her mother, Diane Marie Padiak, a/k/a Diane Marie Pope (Diane), to her father, Joseph Padiak (Joseph). Upon their divorce, Diane was awarded custody of the child in 1975. In 1978, Diane filed a petition requesting permission to remove Gwendolyn from the State. (Ill. Rev. Stat. 1979, ch. 40, par. 609.) Joseph then filed a counterpetition seeking a modification of custody under section 610 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 610). Subsequently, the petition to remove the child from the State was withdrawn and the hearing proceeded on Joseph's petition to modify custody.

Diane Pope appeals from the court's order modifying custody and alleges that the trial court erred (1) in changing custody of the child without proof of any actual, tangible harm in making its determination that the child's present environment endangered seriously her physical, moral, or emotional health; (2) in refusing to consider the child's preference as to her custodian or to interview the child; (3) in taking judicial notice, on its own, of a record in another case and using that record in formulating its decision in the case at bar; and (4) in making findings not supported by the evidence and drawing unwarranted inferences from certain evidence.

Diane Pope, the first witness at the hearing, was called under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60) and testified as follows. She presently resides in Batavia, Illinois, with Gwendolyn Padiak and Donald Pope III. Since her divorce from petitioner, she was subsequently remarried to Donald Pope, Jr., in 1977, but this marriage was also terminated by divorce. Custody of Donald Pope III, the child of Diane's marriage to Donald Pope, Jr., was awarded to Diane at the time of that divorce.

Diane testified to living at a number of different residences since her divorce from Joseph Padiak. At one time, she had lived in an apartment complex in Elgin, Illinois, although she could not recall the exact address. On two occasions while she lived in Elgin, men had broken into her apartment and attempted to rape her. On a third occasion, a man attempted to rape her while she was sitting in the front yard of her apartment building. Diane indicated that she did not report any of these incidents to the police.

Diane also testified that while she was living with her former husband, Donald Pope, Jr., she had had arguments with him. On one such occasion, a neighbor became upset and called the police. Diane indicated that Pope was arrested and jailed on three separate occasions for driving while under the influence of alcohol. On one occasion, he was incarcerated for a period of seven days. Diane also stated that, at one time, both she and Pope had possessed guns.

Diane then testified that a man named Dan DeHaeseleer lives directly opposite of her present apartment. DeHaeseleer had given her $150 on one occasion and $130 on another. She had been seeing DeHaeseleer socially for about eight months but the relationship had "cooled" recently. Diane related that one evening, after she and DeHaeseleer had returned from a Halloween party, she had been raped by another man who lived next door to her. She notified the police but did not make a written report because "I didn't want to endanger my family over convicting somebody."

Diane later testified that her present source of income is welfare and child-support payments from Joseph Padiak. She also admitted to her use of marijuana "a couple of times a month."

She then related an incident which occurred during the time that she was living with Donald Pope, Jr. She stated that Gwendolyn had approached Mr. Pope and attempted to unzip his pants. She testified that she notified Joseph Padiak of this incident the same day. Diane stated that Gwendolyn had attempted the same thing with other male visitors.

Jim Forrester, who has known Joseph Padiak and his wife Mary Padiak "for the past three or four years" then testified that he had been on a vacation with Joseph, Mary, and Gwendolyn Padiak. He stated that Joseph and Gwendolyn had a "[l]oving, father-daughter relationship." Forrester described Gwendolyn and Mary's relationship as follows: "Its a friendly relationship. Yet its more of a motherly relationship, that what Mary says goes and Gwen needs this." On cross-examination, Forrester testified that from his observation of Gwendolyn, she appeared normal, healthy, and well-adjusted.

Joseph Padiak's present wife, Mary Padiak, testified that she and Joseph have been married since May 20, 1978, and they have one child,

Justin Joseph, who was born on June 18, 1980. She characterized her relationship with Gwendolyn as "excellent" and described many of the activities that she engages in with Gwendolyn and Joseph.

Joseph Padiak then testified on direct examination. He is employed by Pools Unlimited as a service manager. He had visited Diane Pope at her apartment in Elgin and described it as a "dirty," "low-income" neighborhood, and he felt that it was not a proper place for Gwendolyn to live.

Joseph also testified to one occasion where he visited Gwendolyn at Diane's apartment at "Cumberland Green." Joseph stated that a gun was lying on a chair in the living room in Gwendolyn's presence while Diane and Donald Pope were on the upper floor of the apartment. He also stated that he felt that Gwendolyn was not always adequately dressed considering the amount of money that Diane Pope was receiving in the form of child-support payments. He testified that he had not heard about Gwendolyn's attempt to unzip Donald Pope's pants from Diane and was upset as a father that he learned of it much later from a third party.

Donna Capocasa, a neighbor of Diane Pope who has known her for eight months, then testified. Capocasa is familiar with Gwendolyn and visits Diane Pope's apartment approximately once a week. She stated that Gwendolyn shares a bedroom with "Donnie," the child from Diane's marriage to Donald Pope, and described the apartment as "clean" and "nice."

Capocasa also testified to a conversation that she had with Gwendolyn. Capocasa stated that Gwendolyn was crying and upset about the possibility of having to move in with her father. Gwendolyn indicated to Capocasa that she did not want to live with her father. The witness further testified that Gwendolyn was a "good girl" and "very mature for her age."

Florence Martin, Diane Pope's mother, testified that Diane had lived with her for a period of five or six months in 1978. Martin stated that on one occasion when Joseph Padiak failed to call and inform Diane that he would be exercising his visitation rights, Diane made other plans for Gwendolyn. Martin testified that when Padiak arrived at her home, he pounded so hard on the door that she called the police. The witness indicated that, on a previous occasion, Joseph Padiak had broken down her front door.

Janis Larsen, Diane Pope's sister, testified that she frequently "baby-sat" for Gwendolyn during a period of 17 months in 1978 and 1979. Larsen stated that on one such occasion Gwendolyn "got up on the couch and she laid on her back and bent her legs and her knees and spread her legs apart and then asked my son David to come over and to blow on her butt * * *."

Larsen then related another incident concerning Joseph Padiak which

occurred at a church in St. Charles, Illinois. Larsen had taken Gwendolyn to Sunday school in the morning and, when she returned to pick Gwendolyn up, Joseph Padiak was present. According to Larsen, Joseph "threw himself into a violent and frightening rage" and he was "screaming and yelling so loudly and so incoherently, [she] couldn't understand what he was saying." Larsen stated that this display frightened Gwendolyn and that she began to cry.

Dorothy Miller, a social worker employed at the Sunnyridge Family Center in Wheaton, Illinois, also testified at the hearing. Miller described the Sunnyridge Family Center as "a multi-service agency providing residential treatment to adolescent boys, adoption, foster-care services, family life education, and out-patient counseling." The Center had been contacted in order to make a custody recommendation regarding Gwendolyn Padiak. Miller had interviewed Diane Pope, Joseph Padiak, and Gwendolyn Padiak.

In her interview with Diane Pope, Diane expressed concern over the effect the custody dispute was having on Gwendolyn. Miller's impression of the parenting aptitude of Diane Pope was that "she was aware of the needs of the child and was attempting to —to meet them in the best possible manner."

Miller testified that during her interview with Joseph Padiak, he "had covertly accused [Diane Pope] of sexual liasons outside of the marriage, but again there was no substantiation of this." Miller concluded that she felt that Joseph was not particularly receptive to Gwendolyn's needs or feelings.

Miller stated that she was asked to make another evaluation since Joseph and Mary Padiak were not pleased with her initial recommendation. Miller's opinion, however, did not change based on the second interview. Miller stated that her opinion based on the two interviews was that Diane Pope should retain custody of Gwendolyn.

Diane Pope then testified again on direct examination that Gwendolyn was not aware of the rape that occurred in her apartment building in Batavia. She also stated that although she had spent some nights at Dan DeHaeseleer's apartment when Gwendolyn was with her father, Gwendolyn was also unaware of these occasions.

Dr. Harry E. Gunn, a clinical psychologist, testified that he had conducted interviews and various psychological tests on Diane Pope, Joseph Padiak, Mary Padiak, and Gwendolyn Padiak.

With reference to his testing of Diane Pope, Gunn stated that "there was a superficiality of warmth so that this would not be an individual, I felt, who could easily invest herself deeply with other people and be concerned about their needs." Gunn further described Pope as sexually

"seductive" and indicated that Gwendolyn could be inclined to imitate that kind of behavior.

As to his examination of Gwendolyn, Gunn stated that she appeared to have been "tutored as to what to say at the time of testing." Gwendolyn made many spontaneous statements among which was "I like mommy better." Gunn testified that although Gwendolyn was not psychotic, she was beginning to develop signs of "neurotic types of conflicts." Gunn related that Gwendolyn was having trouble developing a self-concept and of formulating an idea of how to relate to other people.

The doctor then testified in reference to his examination of Joseph Padiak. Gunn stated that Padiak was "very up front, who comes with his conflicts out in the open, and consequently someone that one can find it relatively easy to relate to." Gunn further indicated that Padiak would relate to Gwendolyn "with warmth" and that he showed a strong desire for Gwendolyn's growth and development. Gunn then summarized his observations of Mary Padiak as "an ideally nurturing and mature person." Finally, Dr. Gunn indicated "unequivocally" the father's home was better suited for the nurturing of Gwendolyn. Gunn also stated that remaining with her mother presents an emotional endangerment to Gwendolyn.

A modification of custody pursuant to section 610(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 610(b)) requires a showing that the child's present environment endangers seriously his physical, mental, moral or emotional health. Diane contends that the court erred in modifying custody without any proof of actual harm to the child. Section 610(b) provides in pertinent part:

> "The court shall not modify a prior custody judgment unless it finds, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interest of the child. In applying these standards the court shall retain the custodian appointed pursuant to the prior judgment unless:
>
> * * *
>
> (3) the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him." (Ill. Rev. Stat. 1979, ch. 40, par. 610(b).)

Further, section 610(b) reflects an underlying policy favoring the finality of child custody judgments and making their modification more difficult. (*In re Custody of Harne* (1979), 77 Ill. 2d 414, 420, 396 N.E.2d 499.) This section further creates a presumption in favor of the present custodian in

order to promote stability and continuity in the child's custodial and environmental relationships which is not to be lightly overturned. *In re Harne; In re Marriage of Gunter* (1981), 93 Ill. App. 3d 1043, 1048, 418 N.E.2d 149.

Initially, it must be noted, that the testimony of Dr. Harry Gunn indicated that Gwendolyn's present environment endangered seriously her moral and emotional well-being. Gunn stated that Gwendolyn was "showing signs of beginning some neurotic types of conflicts" and that she was having difficulty in developing a self-concept and in knowing how to relate to other people. Gunn also testified that the "mother's seductivity may be stimulating Gwen in directions that Gwen cannot handle at the present time." In response to the question of whether Gwendolyn's present environment constitutes actual emotional endangerment, Gunn responded, "absolutely." It is clear, therefore, that Diane is mistaken in her argument that the record is devoid of any evidence of actual emotional harm to the child.

However, there was also substantial evidence presented that indicated that, if Gwendolyn remained in the custody of her mother, there was a strong possibility of future endangerment. Dr. Gunn testified as follows in response to a question pertaining to the long-term effects that retaining custody in the mother might have upon Gwendolyn:

"I would feel that Gwen would run the risk of being quite superficial in terms of how she relates to key family members, and of course to people who are going to become family members, boyfriends and so forth.

Secondly, it is my judgment that the mother has not been one who has experienced joy, affection, pleasure sexually, and I believe that Gwen runs a risk of going in the same direction.

Thirdly, I feel there is a danger of Gwen learning to manipulate other people, to create false impressions, to act one way to get an infantile type of attention.

Fourth, I see a danger in not expressing emotion directly, but going round about.

And fifthly, I would feel there is the risk of Gwen's development being arrested so that she doesn't move in the direction of becoming a mature, responsible, reality relating type of individual."

Testimony at the hearing also established that Diane Pope was unemployed and had been unemployed for a substantial period of time prior to the hearing, had a volatile and unsuccessful marriage to Donald Pope, had maintained numerous residences after the termination of her marriage to Joseph Padiak and had herself been subject to sexual attack on several occasions. Such an unstable situation can only be seen as an

indication of an environment detrimental to the emotional development of the child. See *In re Custody of Russell* (1979), 80 Ill. App. 3d 41, 45, 399 N.E.2d 212.

Diane has cited no authority for the proposition that the court may only consider present actual harm to the child as opposed to the likelihood of future endangerment. In fact, there is language in some recent Illinois decisions that suggests the opposite proposition. For example, in *In re Custody of Nodot* (1980), 81 Ill. App. 3d 883, 401 N.E.2d 1189, the court stated:

> "As contemplated in the statute, a serious present endangerment to physical, mental, moral or emotional health is not necessarily one which, if realized, must be manifested at once or within a certain discernible period of time; the long-range as well as immediate interests and welfare of the child are the subject of section 610(b). (See, *e.g.*, *Harne*, 77 Ill. 2d 414, 422.)" (81 Ill. App. 3d 883, 892, 401 N.E.2d 1189.)

Similarly, in *De Franco v. De Franco* (1978), 67 Ill. App. 3d 760, 384 N.E.2d 997, where the issue was the effect of the custodial parent's adulterous relationship upon the child, the court stated:

> "The tie between an adulterous relationship and its effect upon minor children does not lend itself to precise, empirical proof. Such an overly technical construction of the language 'conduct * * * that does not affect his relationship to the child,' as asserted by petitioner, would be inconsistent with the statutory mandate that custody be modified where 'the child's present environment endangers seriously his * * * mental, moral or emotional health.' Ill. Rev. Stat. 1977, ch. 40, par. 610(b)(3)." (67 Ill. App. 3d 760, 767, 384 N.E.2d 997.)

Also, in *Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, 400 N.E.2d 421, our supreme court said the following in response to the mother's contention that section 610 of the Marriage and Dissolution of Marriage Act requires the trial court to refrain from modifying custody unless it finds that the children have suffered "actual tangible harm":

> "The statute, however, directs the trial court to determine whether 'the child's present environment *endangers* seriously his physical, mental, moral or emotional health.' (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 40, par. 610(b)(3).) In some cases, particularly those involving physical harm, it may be appropriate for the trial court to determine whether the child is endangered by considering evidence of actual harm. In cases such as this one, however, such a narrow interpretation of the statute would defeat its purpose. * * * To wait until later years to determine whether Jacqueline had inculcated her moral values in the children would be to await a

demonstration that the very harm which the statute seeks to avoid had occurred. Measures to safeguard the moral well-being of children, whose lives have already been disrupted by the divorce of their parents, cannot have been intended to be delayed until there are tangible manifestations of damage to their character." 78 Ill. 2d 337, 348-49, 400 N.E.2d 421.

We consider this language both persuasive and determinative of the issue presented here. This is particularly so in view of Dr. Gunn's testimony of seven-year-old Gwendolyn's present manifestation of neurotic types of conflicts and testimony about Gwendolyn's inappropriate comments about sex on several occasions. Often, it is difficult to present evidence showing present, objective effects that a custodial parent's conduct and environment would have on a minor child as the subjective effects resulting from such an environment may make their presence known at a future time. (*Gehn v. Gehn* (1977), 51 Ill. App. 3d 946, 949, 367 N.E.2d 508.) We therefore, do not construe section 610(b)(3) to require that there must be actual harm to the physical, mental, moral or emotional health of the child before a change in custody can be awarded. Rather, the statute in expressly prescribing that "the child's present environment endangers seriously his physical, mental, moral or emotional health" contemplates potential harm as well as present harm as a result of the child's present environment.

■■ The traditional rule in regard to modification of custody is that the decision rests within the sound discretion of the trial court and will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. (*In re Custody of Scott* (1979), 75 Ill. App. 3d 710, 714, 394 N.E.2d 779.) After a careful review of the record, we believe there is sufficient evidence to support the trial court's decision to change custody of the minor child, and we further find that the modification was consistent with the statutory requirements and purposes of section 610(b).

■■ Diane also suggests that, in a proceeding for modification of a custody decree, the court should not consider conduct of a parent of which the child is unaware. Although section 602(b) of the Act provides that, in determining the best interest of the child, the court shall not consider the conduct of the present or proposed custodian that does not affect his relationship to the child (Ill. Rev. Stat. 1979, ch. 40, par 602(b)), this section does not go so far as to say that any parental transgression, if kept from the knowledge of the child, cannot be considered by the trial judge. Such would be an overly broad interpretation of this provision. Countless situations can be imagined where, although the custodial parent's conduct is harmful and presents an endangerment to the child, the child is still unaware of such conduct. The "best interest of the child" may necessitate removing the child from the potentially harmful environment irrespective of his state of knowledge.

■■ Diane next asserts that it was error for the trial court to refuse to consider the child's preference as to her custodian and to refuse to interview the child. Section 604 of the Marriage and Dissolution of Marriage Act provides that "[t]he court may interview the child in chambers to ascertain the child's wishes as to his custodian and as to visitation." (Ill. Rev. Stat. 1979, ch. 40, par. 604(a).) The use of the word "may" in section 604 indicates that the choice of whether or not to conduct an interview is a matter within the discretion of the trial court. (*DeYoung v. DeYoung* (1978), 62 Ill. App. 3d 837, 841, 379 N.E.2d 396; see also Ill. Ann. Stat., ch. 40, par. 604, Historical and Practice Notes, at 56 (Smith-Hurd 1980).) Courts in other jurisdictions have interpreted this provision of the Uniform Marriage and Divorce Act in a similar manner. (See, *e. g., Easton v. Easton* (Mont. 1978), 574 P.2d 989; *In re Marriage of Davis* (Colo. App. 1979), 602 P.2d 904.) On the record before us, it does not appear that the trial judge abused his discretion in refusing to interview Gwendolyn. During the hearing in the present cause, counsel for Diane Pope made a motion for the court to interview Gwendolyn. The court reserved ruling on the motion until the close of all of the evidence. At the close of all the evidence, the court indicated that, in light of all the foregoing testimony, an interview with Gwendolyn would not be of aid to the court's decision. Gwendolyn was seven years old at the time of the hearing, and the record shows that the court felt that she was not of "sufficient maturity to intelligently express a preference" that would aid in the court's decision. (*De Franco v. De Franco* (1978), 67 Ill. App. 3d 760, 771, 384 N.E.2d 997.) We find no abuse of discretion in the court's refusal to interview Gwendolyn.

■■ Diane Pope next contends that it was error for the trial court to take judicial notice of a record in a previous case. In its written judgment, the court described the conditions of Diane's marriage to Donald Pope, Jr., and made the following comment:

> "For the most part the foregoing describes the background of the current hearing, all of which may be found in court files of this case and case 79-D-14519 entitled 'In re the marriage of Diane Marie Pope and Donald D. Pope, Jr.' "

Although Illinois courts have recently announced a more liberal policy with regard to the taking of judicial notice of records of other proceedings in other courts (see, *e.g., People v. Davis* (1976), 65 Ill. 2d 157, 357 N.E.2d 792, and *Filrep, S.A. v. Barry* (1980), 88 Ill. App. 3d 935, 410 N.E.2d 1137), we believe that it was error for the court to do so here. Neither party had requested the court to take judicial notice of the records of these proceedings; hence, there was no opportunity to be heard as to the propriety of taking such notice.

■■ However, not all error mandates reversal, and we must determine whether this error operated to the prejudice of the appellant. (*In re Estate*

*of Weisberg* (1978), 62 Ill. App. 3d 578, 586, 378 N.E.2d 1152.) During trial, respondent was extensively questioned about her marriage and subsequent divorce from Donald Pope, Jr., and it does not appear that the court's consideration of the record of Diane and Donald Pope, Jr.'s, divorce influenced its decision. As the court intimated, the evidence adduced at trial in the present case merely repeated what the record in the prior case disclosed. Since the consideration of that record did not effect the disposition of this case, it cannot be considered as prejudicial to require reversal.

Diane's final contention is that the trial court made certain findings not supported by the record and drew unwarranted inferences from certain evidence. We agree that the record does not support several of the conclusions presented by the trial court in its written decision, particularly the inference that Diane Pope was "[p]aid for sex" by Dan DeHaeseleer. Although Diane testified that DeHaeseleer had given her a total of $280 and that the two did have sexual relations, there is no indication in the record that one was paid in consideration for the other. However, we do not find this statement, nor the others complained of by Diane in her brief, to be sufficient to warrant reversal.

■■ Although the court may have made unwarranted inferences, these were not by any means the only basis for its decision. The court noted the instability of the environment provided by the mother, her frequent changes in residence, her unsuccessful remarriage, her poor choice of male companions who associated with her in the presence of Gwendolyn, the fact that she is unemployed and the opinions of Dr. Gunn. The court compared these factors with the environment provided by the father, which was characterized as follows:

> "A stable family relationship of the father, long steadily employed, a new wife, a new child in his family and a newly built home with a stepmother with whom the child already has a good relationship and who wants to have this child as part of her family * * *."

Since there was sufficient other evidence in the record to indicate that the best interest of the child would be served by a modification of custody to the father, the fact that the trial court may have made certain unwarranted inferences is not prejudicial error.

Accordingly, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

VAN DEUSEN and UNVERZAGT, JJ., concur.