**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 250101-U

Order filed October 20, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| THOMAS NEAL, | ) | Du Page County, Illinois, |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Appeal No. 3-25-0101 |
| and | ) | Circuit Nos. 22-DC-915, 22-OP-1407 |
| | ) | |
| MARIO NEAL, | ) | Honorable |
| | ) | Neal W. Cerne, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BERTANI delivered the judgment of the court.
Justices Holdridge and Anderson concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   The circuit court did not abuse its discretion in ordering respondent to undergo an Illinois Supreme Court Rule 215 psychological examination where his mental condition was in controversy. The court's finding that respondent's conduct seriously endangered his children was not against the manifest weight of the evidence, and its decision to suspend his parenting time until undergoing psychological examination was not an abuse of discretion.

¶ 2     Respondent, Mario Neal, a self-represented litigant, appeals from the circuit court's dissolution judgment that dissolved his marriage to petitioner, Thomas Neal, and suspended his

parenting time indefinitely for his failure to comply with a court-ordered psychological examination. On appeal, Mario argues the circuit court erred in ordering his mental examination and in placing a restriction on his parenting time.[1] We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        The parties were married on June 28, 2014. Three children were born to the marriage by way of surrogacy: J.N. born in 2015, A.N. born in 2018, and L.N. born in 2018. At all relevant times, the parties' children attended a private school, All Saints Catholic Academy (All Saints), in Naperville, Illinois. On October 11, 2022, Thomas filed a petition for dissolution of marriage, and Mario counter-petitioned eight days later. The following month, the circuit court entered an agreed temporary order allocating equal parenting time between Thomas and Mario and appointing a guardian *ad litem* (GAL).

¶ 5        Mario's theories of conspiracy largely shaped the ensuing pretrial litigation. He believed that the court, the GAL, employees at the children's school, his lawyer, Thomas's lawyer, and court-appointed evaluators all were engaged in improper conduct including covering up or failing to thoroughly investigate allegations that Thomas and his family members abused the children. He conveyed those theories in e-mail messages to the children's school, to the GAL, in motions, responses, and in court filings seeking the removal of court-appointed evaluators. He authored a website that published his theories and identified those he believed were complicit in the alleged cover-up. He contacted local and state police, elected officials, and the Child Advocacy Center in Du Page County and filed complaints with the Illinois Department of Financial and Professional

---

[1]We note that this cause was brought pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018), which requires that the appellate court issue its decision within 150 days after the filing of a notice of appeal in cases involving parenting time, except for good cause shown. However, due to motions filed regarding supplementing the record, the reply brief was filed after the 150-day deadline. As such, we find good cause exists to extend the time for this decision.

2

Regulation against the court-appointed evaluators. Each determined his complaints were unfounded. Likewise, the three Department of Children and Family Services investigations against Thomas were determined to be unfounded.

¶ 6    In March 2023, Thomas filed an emergency motion which sought suspension of Mario's regular parenting time asserting, *inter alia,* that Mario made abuse allegations in the presence of the children and combatively communicated with school officials. The court conducted a conference on Thomas's motion and recommended that an evaluator be appointed pursuant to section 604.10 of the Illinois Marriage and Dissolution of Marriage Act (Act). 750 ILCS 5/604.10 (West 2022). While Dr. Roger Hatcher was discussed as a potential evaluator, he could not be appointed as a 604.10(b) evaluator, being that he was not on the Du Page County evaluators list. *Id.* § 604.10(b).

¶ 7    On April 10, 2023, Thomas filed a combined motion for the appointment of Hatcher as a 604.10(c) evaluator, an evaluation of the parties, and an Illinois Supreme Court Rule 215 mental examination of Mario. *Id.* § 604.10(c); Ill. S. Ct. R. 215(a) (eff. Jan. 1, 2018). An agreed order was entered appointing Hatcher and continuing Thomas's request for the Rule 215 examination.

¶ 8    Mario began representing himself in the fall of 2023. Thomas filed a motion to compel Mario's cooperation after he refused to attend follow-up meetings with Hatcher after his initial appointment. During a November 22, 2023, hearing on the motion, Hatcher testified that Mario had communicated his belief that he was "compromised," and Hatcher could not go forward with his examination because Mario would not cooperate. He further testified that Mario made "concerning statements about the children's emotional condition" and opined that Mario needed "to be evaluated for emotional stability immediately." The court asked Mario whether he was willing to continue the 604.10(c) evaluation. Mario replied that he was willing but did not "feel

3

that [he] can trust" Hatcher. The court ordered Mario to promptly contact Hatcher and participate in his evaluation.

¶ 9        The hearing on the request for Mario's Rule 215 examination was held on December 7, 2023. The court found that a clinical assessment of Mario on the impact of the alleged abuse would assist the court in rendering a final decision related to parenting time and that Mario's mental health was in controversy. It ordered Mario to undergo a Rule 215 mental health examination with Dr. Robert Shapiro and directed the cooperation of each party with Shapiro. On that day, Mario filed a motion to remove the GAL citing, among other concerns, her purported collusion to cover up the alleged abuse. He appended e-mail communications to his motion, which included a photograph of one of his child's bare buttocks. Thomas successfully moved to seal the motion on an emergency basis. Thereafter, Mario, without proper notice, filed numerous documents including an emergency motion to reconsider the Rule 215 order and a letter to the judge requesting investigation into his attorney, Thomas's attorney, and the GAL.

¶ 10        On December 21, 2023, Thomas filed an emergency motion for turnover of the parties' minor children, requesting sole decision-making and restricting Mario's parenting time. The attached affidavit of Hatcher described additional clinical interviews with Mario and his review of Mario's psychiatric records from a prior in-patient hospitalization, numerous e-mail communications, and psychiatric medications most recently known to be taken by Mario. He opined that Mario had become paranoid in his beliefs and demonstrated "unusually poor self-regulations" in behaving with school personnel and the GAL. He was unaware whether Mario was receiving current professional treatment or actively taking his prescribed medication. He was, "[h]owever, *** confident beyond a reasonable degree of psychological certainty that" Mario was "severely psychiatrically impaired" but unable to opine whether his impairment represents an

4

"acute psychiatric episode, a consequence of substance abuse *** , a severe personality disorder, or some combination of the three." He further opined that the children were at a substantial risk of emotional and physical neglect and harm as a consequence of Mario's impairment. He recommended Mario's contact with the children be suspended until he complied with court-ordered procedures including submitting to the Rule 215 mental examination.

¶ 11    A hearing was conducted on Thomas's emergency motion the following day. Mario did not appear. The GAL testified about e-mail communications Mario sent to herself, Hatcher, and the children's school. She described numerous escalating and accusatory e-mails Mario sent to the school aimed at teachers and the school's social worker. As a result, the general counsel for All Saints prohibited Thomas and Mario from contacting the school. Consistent with his emergency motion, Thomas testified that among the communications sent to All Saints, Mario sent the photograph of their child's bare buttocks previously placed under seal by the court. He testified to heated accusations and outbursts Mario made in the presence of their children during the prior parenting time transition, which was not an isolated event. Mario also attempted to prohibit the children from engaging in Hatcher's evaluation and from seeing the GAL.

¶ 12    The court granted Thomas's emergency motion. Pursuant to section 603.10 of the Act, it found by a preponderance of the evidence that Mario had engaged in conduct that seriously endangered the children's health. 750 ILCS 5/603.10 (West 2022). It considered the best interest factors listed in sections 602.5 and 602.7 of the Act to find that Mario's parenting time be temporarily reduced to supervised parenting time once per week at the Du Page County Family Center in order to protect the children. *Id.* §§ 602.5, 602.7. The court prohibited Mario from contacting the All Saints staff and administration until further order of the court. Thomas was awarded sole decision-making responsibilities for the children's educational decisions.

¶ 13    Meanwhile, Mario appealed the court's Rule 215 order, which this court dismissed on February 9, 2024, for lack of jurisdiction. *In re Marriage of Neal*, No. 3-23-0777 (Feb. 9, 2024) (unpublished minute order).

¶ 14    Mario flouted several court orders in the months leading up to the parties' dissolution trial. He refused to meet with Hatcher and Shapiro. During hearings on Thomas's petition for rule to show cause to compel Mario's participation, Mario conveyed that he did not intend to meet with either evaluator. His rationale for noncompliance included the unsupported assertion that Hatcher was under criminal investigation and that there was no legal foundation for the court-ordered Rule 215 examination.

¶ 15    Mario e-mailed All Saints staff and administration as well as parents of All Saints students, continuing to allege the school was concealing abuse. A police presence was established at the school as a result of his behavior. Following a hearing in April 2024, the court issued a rule to show cause ordering Mario to participate in the 604.10(c) evaluation and Rule 215 mental examination. However, when the case was reassigned to another judge, the court discharged the rule but informed Mario that his refusal to participate in court-ordered examinations would be held against him.

¶ 16    Mario once more filed a motion to remove the GAL, reattaching the photograph of his child's bare buttocks. The GAL subsequently requested and was granted discharge after Mario threatened her in communications in June 2024. Eight months after Mario's mental examination was ordered, he scheduled an initial examination session with Shapiro. Before the examination took place, however, Mario alleged collusion and threatened Shapiro that he would be reported to the authorities. The court also granted Shapiro's request to withdraw.

¶ 17    A. Trial

6

¶ 18        The parties' dissolution petitions proceeded to a four-day bench trial in December 2024. Testimony was elicited from Hatcher, Mario, and Thomas. Before the second day of trial, Mario's former attorney, William Cherny, also presented a fee petition and was examined by Mario.

¶ 19                                  1. Dr. Roger Hatcher

¶ 20        Hatcher testified to his section 604.10(c) evaluation. A clinical psychologist for 50 years, he conducted more than 1000 custody evaluations. He met with Mario on four occasions during which Mario exerted a clear paranoia of his involvement and belief of collusive behavior between him, the attorneys, Thomas, and the court. Each of these meetings was sidetracked with Mario's concerns such that Hatcher was unable to obtain a psychosocial history or conduct a direct mental status examination beyond his general observations.

¶ 21        During their initial remote meeting, Mario conveyed his belief that someone else was present in the office with Hatcher, asking whether Thomas or his attorney was present. Hatcher relied, in part, on Mario's 2020 psychiatric and substance abuse records from the Hazelden Betty Ford program. Mario's diagnoses included generalized anxiety disorder, post-traumatic stress disorder, severe alcohol and substance abuse, and major mood disorder. Hatcher's observations corroborated the anxiety and stress disorder findings in that he noted Mario was a highly anxious, highly agitated individual on each occasion they met.

¶ 22        Mario refused to discuss any current treatment or care he was receiving for these diagnoses. He refused to bring his children to his meetings with Hatcher and eventually stopped coming to appointments which precluded the completion of Hatcher's evaluation. Mario agreed to only one standardized psychological examination, the Millon Clinical Multiaxial Inventory, before discontinuing his evaluation. Consistent with Hatcher's clinical observations, that test revealed elevated anxiety scales, one elevated thinking scale, and significant elevation on the delusional

disorder scale. He opined that Mario "has strong paranoid beliefs. But I don't know that they ***

reach the level of a psychotic delusion" later explaining, "I couldn't spend enough time with him

to get enough information from him to know" whether his beliefs arose to fixed delusions.

¶ 23　　Hatcher testified to his December 2023 affidavit that averred Mario's mental state was in

crisis. He was concerned that the children were being compromised by Mario's extreme agitation

and feared for the children's psychological stability. Should Mario's condition worsen, he worried

about the physical safety of the parties' children. Therefore, he had recommended an independent

full psychological examination pursuant to Illinois Supreme Court Rule 215. Such examination

would have provided the information necessary to complete his own evaluation. No examination

took place.

¶ 24　　Hatcher also testified to his 12-page parenting evaluation report dated October 9, 2024. His

report juxtaposed the parties' conditions. He opined Mario was "not competent to safely provide

care for the children." Thomas appeared "well-functioning, emotionally stable and willing to put

the needs of the children ahead of his own." He recommended restricted parenting time between

Mario and the children, and that visitation be restricted "at one level or another, depending on his

progress in treatment." He considered all relevant statutory factors in coming to that determination.

¶ 25　　During cross-examination, in response to why he did not reach out to Mario's medical

providers, Hatcher explained Mario did not consent for him to contact care providers. Hatcher

testified that he reviewed the records from the outpatient facility after Mario's Hazelden stay,

where he was treated for substance abuse with alcohol medications that are intended to control

cravings for alcohol and other compulsive behaviors for a 12-month period.

¶ 26　　In support of his recommendation to restrict parenting time, Hatcher stated the following

in response to Mario's cross-examination:

"it is my opinion that you are unpredictable in your behavior, unstable in your mood, inattentive, extraordinarily anxious to the point of being paralyzed by it. You use poor judgment in discussing things with the kids or with anyone else and show poor understanding of yourself or the situation you are in."

### 2. William Cherny

Mario's former attorney, William Cherny, presented a fee petition during the second day of trial. Prompted by Mario's questioning, Cherny testified that he was concerned about his safety based on threatening e-mails and statements Mario published on his website. According to Cherny, Mario threatened to "file criminal charges" against him based on his alleged collusion with Thomas's attorney and the GAL. He shared his concern that Mario was "a risk to people."

### 3. Mario Neal

Mario testified that after the December 2023 order restricting his parenting time, he had a number of supervised visits with his children at the Du Page County Family Center, the last of which occurred on May 1, 2024. Mario discussed the website that he operated for much of 2024, which alleged his children were victims of abuse and identified the children's school and certain school employees, the GAL, Hatcher, his prior attorney, Thomas's attorney, and the Naperville Police Department as complicit "[a]ccomplices" of abuse cover-up. The website included photographs of his children. Printouts of the website were introduced into evidence. On May 13, 2024, Mario sent an email addressed to the All Saints community as a call to action for reporting misconduct, directing the e-mail recipients to his website. All Saints eventually issued Mario a no trespassing notice. He admitted that he placed a sign advertising his website a couple houses from where Thomas and the children reside in August 2024.

¶ 31        Mario admitted to contacting state and local police, the federal bureau of investigations, the Du Page Child Advocacy Center, and elected officials. He was aware that the Department of Children and Family Services determined his allegations against Thomas were unfounded. He admitted to filing a complaint against the GAL with the Attorney Registration and Disciplinary Commission and complaints with the Illinois Department of Financial and Professional Regulation against Hatcher and Shapiro. He agreed that none of his complaints had come back founded. He filed a police report accusing the GAL of hacking his computer and accused Thomas of breaking into his home. He conceded that he never submitted to the court-ordered Rule 215 examination. Mario requested primary custody of the children.

¶ 32                                                4. Thomas Neal

¶ 33        Thomas testified that he solely parented the parties' children for the preceding year. He discussed the negative impact Mario's website had on the children. The school community was "petrified as to the contents of the website," resulting in social disengagement by the children's peers. As a result of the website and Mario's e-mails, a police presence was established on the school grounds and the school contemplated removing the children. He testified that Mario prevented the children from seeing the social worker at All Saints based on his purported belief that she failed ethical obligations to report the alleged abuse. An email introduced at trial corroborated that testimony.

¶ 34        Thomas testified his children would be in grave danger should they be removed from his custody and placed with Mario. He testified that Mario spent seven weeks during the summer of 2020 at Hazelden Betty Ford rehabilitation center and received follow-up treatment at Symetria Recovery Center "for about a year" thereafter. Thomas received a call from Symetria in 2021 informing him that Mario had not been attending his appointments.

¶ 35    Thomas introduced video and photographic evidence of several instances in August 2024 where Mario returned some of Thomas's and the children's possessions by "smash[ing]" them on Thomas's front lawn. One such occasion required police intervention after Mario "pound[ed]" on Thomas's door in the children's presence.

¶ 36                              B. Judgment for Dissolution of Marriage

¶ 37    The court entered a judgment for dissolution of marriage on January 24, 2025. The judgment recognized Mario's constant stream of accusations of abuse and unethical behavior for which "[n]o known action has been taken as a result of investigating these accusations." It further concluded that there was no abuse against the children in that "no credible allegation, nor any evidence of any abuse directed against the children" was presented.

¶ 38    The court found a need to restrict Mario's parenting time and found his conduct rose to the level of endangerment. It explained that Mario's attempt to publicly litigate and involve the children's school community showed little regard for his children's privacy and well-being.

¶ 39    Further, Mario's refusal to cooperate with clinical examination, particularly the Rule 215 examination, created "a serious void in the information the Court need[ed] to make a competent decision on Mario's parenting time." The lack of cooperation raised concerns about his mental status given the significant mental health issues raised at trial. It found Hatcher's limited observations of Mario's mental instability noteworthy.

¶ 40    The court was particularly concerned by his behavior which resulted in his former attorney and the GAL feeling threatened, the issuance of a no trespass notice by All Saints, and a restriction on his communication with the school. It characterized evidence of Mario cavalierly returning the children's possessions on Thomas's lawn and the lack of confirmation that he was taking his

11

prescribed psychiatric medications as troubling and his allegation that his computer had been hacked as "not being believable."

¶ 41   In contrast, it noted that Thomas acted in the best interest of his children whereas Mario did not, principally citing Mario's choice to publicly involve his children in the parties' dissolution, operating his website, attaching inappropriate pictures of his child to pleadings, and interfering with the children obtaining care from mental health professionals. It awarded Thomas all parenting time and concluded that Mario's parenting time was subject to review should he submit to a court approved Rule 215 mental examination.

¶ 42   Mario appeals.

¶ 43                            II. ANALYSIS

¶ 44   Mario presents two primary appellate contentions. First, he asserts the circuit court improperly ordered his psychological examination pursuant to Illinois Supreme Court Rule 215(a). Ill. S. Ct. R. 215(a) (eff. Jan. 1, 2018). Second, he argues the court abused its discretion by restricting his parenting time. Broadly, he argues that the indefinite suspension of parenting time was not supported by the trial evidence, the court failed to make the requisite finding that his conduct seriously endangered his children, and the restriction is a disproportionate and punitive remedy for his noncompliance with court order.

¶ 45   In violation of Illinois Supreme Court Rule 341, the statement of facts in Mario's brief contains improper comment advancing his conspiratorial beliefs. Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). The argument section, however, is devoted entirely to the issues we have addressed in this order. In his reply brief, Mario improperly introduces new argument, attempting to litigate claims of misconduct against the GAL and All Saints and challenging other areas of the court's dissolution judgment, such as the purported inequitable division of the marital estate. Mario has

12

forfeited these arguments. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 46                                A. Court-Ordered Mental Examination

¶ 47        Before reaching Mario's contention that the restriction of his parenting time was erroneous, we address the basis for the court's restriction: his outright refusal to submit to a court-ordered psychological examination, which weighed heavily in the circuit court's decision to indefinitely suspend his parenting time. Mario argues that the court improperly ordered the examination because it did not make the appropriate findings that his mental health was "in controversy," and the evidence introduced at the time the court entered its Rule 215 order could not support such a finding. These contentions lack merit based on the record before us.

¶ 48        Illinois Supreme Court Rule 215 permits a court to order a party to submit to a mental examination by a licensed professional where the party's mental condition is in controversy. Ill. S. Ct. R. 215(a) (eff. Jan. 1, 2018). "The purpose of the rule is to allow discovery that will assist the trier of fact in reaching its determination." *In re Estate of Silverman*, 257 Ill. App. 3d 162, 171 (1993). The rule does not permit the "unlimited and indiscriminate" ordering of examinations. *In re Estate of Stevenson*, 44 Ill. 2d 525, 529 (1970). Rather, it requires a court to order an examination after careful exercise of its discretion. *Kaull v. Kaull*, 2014 IL App (2d) 130175, ¶ 82. A grant or denial of a Rule 215 examination request is reviewed for an abuse of discretion. *Id.* A court abuses its discretion only when its decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view the court has adopted. *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 49        The circuit court's December 7, 2023, order appointing Shapiro complied with Rule 215 by identifying the examiner, fixing his address and phone number to the order, and imposing a

13

time limitation on the examination subject to Shapiro's availability. Ill. S. Ct. R. 215(a) (eff. Jan. 1, 2018). Thomas's motion for Mario's examination was made well within a reasonable time before trial on the parties' dissolution petitions. *Id.* His initial request came 20 months in advance of trial, and the Rule 215 order was entered a year beforehand.

¶ 50 The Rule 215 order was accompanied by an express finding that Mario's mental health was in controversy. The record at that time was replete with evidence to support this conclusion. Mario made unsupported allegations of abuse and conspiracy, liberally publicized his conspiracy theories, and stated a distrust in the process and in all participants involved in the proceedings. Moreover, his erratic behavior appeared to be escalating. Such a finding was also appropriate where Thomas's motion raised the issue of Mario's mental condition based on his communications of conspiracy which Mario's testimony did not dispute. See *In re Estate of Stevenson*, 44 Ill. 2d at 530 (holding a party's condition may be placed in controversy "irrespective of who has raised the issue"). Further, it appears Mario conceded that his mental health was central to the court's parenting time determination in his response to Thomas's combined motion, stating

> "due to years of mental and physical abuse exacted by THOMAS on MARIO and the minor children the opinion of a clinical psychologist in assessing the impact of those years of abuse would assist the Court in reaching the final decisions related to *** parenting time, and in determining the children's best interests."

¶ 51 Here, the "pleadings show without question" that Mario's mental condition was "in controversy" and support the circuit court's finding. *Id.* We hold the circuit court did not abuse its discretion in ordering Mario's mental examination pursuant to Rule 215.

¶ 52 B. Restriction on Parenting Time

14

¶ 53 Having found that Mario's mental examination was appropriately ordered, we turn to the restriction on Mario's parenting time. Mario offers three ways he believes the circuit court erred in restricting his parenting time. First, he contends the court failed to make the appropriate statutory findings to support the restriction imposed. Second and relatedly, he argues there was insufficient evidence to support a finding of serious endangerment. Third, he asserts that suspending his parenting time is an improper sanction for his violation of the court's discovery order.

¶ 54 Thomas responds that the trial evidence supports the circuit court's finding of serious endangerment and that the suspension of Mario's parenting time was appropriate to protect their children's health and welfare.

¶ 55 Any limitation or condition placed on parenting time is considered a restriction. 750 ILCS 5/600(i) (West 2022). Restrictions are generally disfavored as there is a presumption that both parents are fit to participate in their child's caretaking. *Id.* § 602.7(b); see *Heldebrandt v. Heldebrandt*, 251 Ill. App. 3d 950, 957 (1993) ("[L]iberal visitation is the rule and restricted visitation is the exception."). Section 603.10 of the Act governs restrictions on parental responsibilities, which covers decision-making and parenting time. 750 ILCS 5/603.10(a) (West 2022); *id.* § 600(d) (" 'Parental responsibilities' means both parenting time and significant decision-making responsibilities with respect to a child."). Section 603.10 directs a court to enter orders necessary to protect a child where it finds, by a preponderance of the evidence, that a parent has engaged in any conduct that seriously endangered their child's health or significantly impaired their child's emotional development. *Id.* § 603.10(a); see *id.* § 602.7(b) (requiring a finding of serious endangerment to restrict parenting time).

¶ 56 A court engages in a two-step process when restricting parenting time. *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 58. First, it must make a factual determination on whether a

15

parent's conduct arose to serious endangerment. *Id.*; *In re Marriage of Hipes & Lozano*, 2023 IL App (1st) 230953, ¶ 43. Second, if the evidence presented is sufficient to make such a finding, the court must enter orders necessary to protect the child. *Mayes*, 2018 IL App (4th) 180149, ¶ 58; *Hipes*, 2023 IL App (1st) 230953, ¶ 54. Upon a finding of serious endangerment, a court may impose a "reduction, elimination, or other adjustment of *** parenting time" and "any other constraints or conditions that the court deems necessary to provide for the child's safety and welfare" among other non-exhaustive necessary restrictions. 750 ILCS 5/603.10(a)(1), (9) (West 2022). We address Mario's assertion that the circuit court erred at both steps in turn.

¶ 57                                    1. Serious Endangerment Finding

¶ 58        Section 603.10 requires that a court find serious endangerment before restricting a party's parenting time. *Id.* § 603.10(a). The serious-endangerment standard is an " 'onerous, stringent, and rigorous' " burden. *Mayes*, 2018 IL App (4th) 180149, ¶ 56 (quoting *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 429 (1991)). The party seeking to restrict parenting time bears this burden. *Hipes*, 2023 IL App (1st) 230953, ¶ 43. We review a court's finding of serious endangerment to determine whether it is against the manifest weight of the evidence. *Id.* "A ruling is against the manifest weight of the evidence when, upon review of the entire record, the opposite conclusion is clearly evident." *Id.*

¶ 59        The circuit court's finding of serious endangerment is supported by the record and is not against the manifest weight of the evidence. Thomas carried his burden by introducing Mario's countless attempts to disseminate allegations of unfounded abuse which at times were made in the presence of his children. He has interposed his children into his dissolution litigation. On multiple occasions, he publicly filed a picture of his child's bare buttocks and e-mailed it to the child's school community. Photographs of his children were displayed on his website. Mario's outbursts

16

in front of his children are also well-documented in the record, such as the incident involving the destruction and return of their possessions that required police intervention at their home. When in his custody and before a restriction was placed on his parental responsibilities, Mario discouraged the children from interacting with care providers, including prohibiting them from seeing the All Saints social worker.

¶ 60        Mario directs our attention to one of the circuit court's findings in the dissolution judgment that he argues conflicts with a finding of serious endangerment. In its judgment, the court found that there was "[n]o evidence *** presented to suggest any mental health issues" with the children and that "Dr. Hatcher had no concerns about the children." This argument improperly shifts focus away from Mario's conduct that seriously endangers his children's health and well-being to the result that, despite his conduct, Hatcher did not have notable concerns about the children's condition. An argument that the children are not actively harmed by his conduct bears little relation to whether Mario's conduct seriously endangered their health. See *In re Marriage of Padiak*, 101 Ill. App. 3d 306, 314 (1981) (holding serious endangerment of a child's health "contemplates potential harm as well as present harm").

¶ 61        Furthermore, in addition to Mario's endangering conduct described above, Thomas's trial testimony indicates that the children have been harmed by Mario's conduct. They have been ostracized by the All Saints community due to the fear of danger around Mario's communications and his website. The children are not receiving invitations to social activities including playdates and sleepovers. Therefore, Mario's conduct has not only seriously endangered his children's health, but this testimony also supports the conclusion that he has significantly impaired their emotional development. See 750 ILCS 5/603.10(a) (West 2022).

17

¶ 62     Mario unconvincingly contends that the court erred by relying on Hatcher's report and testimony in reaching its finding of serious endangerment. According to Mario, Hatcher's conclusions were unreliable because he did not have access to Mario's medical file, did not speak to Mario's treating providers, and did not verify his current use of any medications. These limitations were self-imposed by Mario. Mario discontinued meetings with Hatcher, refused to bring his children to the meetings he did attend, refused to give consent to contact care providers or further investigate his mental condition, and did not submit to the court-ordered Rule 215 examination.

¶ 63                    2. Suspension of Parenting Time as a Necessary Restriction

¶ 64     Once a court finds that a parent's conduct has seriously endangered his or her child, it must then determine what restrictions are necessary for the child's protection. *Hipes*, 2023 IL App (1st) 230953, ¶ 54; 750 ILCS 5/603.10(a) (West 2022). We review a circuit court's determination that certain restrictions are necessary for a child's protection under the abuse of discretion standard. *Hipes*, 2023 IL App (1st) 230953, ¶ 54.

¶ 65     Mario argues that the court abused its discretion by suspending a determination on his parenting time until he submits himself to a court-approved Rule 215 mental examination. He insists this restriction is not a protective measure in the best interest of his children, but a punitive action exacted against him. We disagree. While Mario is correct that parenting time must be guided by the best interests of the child and is not a punitive mechanism (*In re Marriage of Knoll & Coyne*, 2016 IL App (1st) 152494, ¶ 44), the record establishes Mario continually refused to comply with court order and submit himself to a mental examination despite the fact that doing so would be in his children's best interest. Mario's mental health concerns were consistently and competently raised throughout the proceedings. Thomas made allegations of prior substance abuse,

18

rehabilitation treatment, and diagnoses. Hatcher confirmed the substance abuse treatment and noted Mario's mental instability had reached a crisis. At several points in the record, Mario conceded that his evaluation would be helpful in determining parenting time and the best interests of the children yet continued to refuse to participate in the examination.

¶ 66     The court was confined by Mario's refusal to participate. Mario chose to leave his medical history, current treatment, and mental condition to guesswork. His erratic conduct during pretrial litigation and persistent messages of conspiracy supported Hatcher's limited finding of paranoid beliefs. In the absence of further context from a complete clinical examination, his fitness to caretake for his children remains uncertain. The court notified Mario of this limitation on multiple occasions. In light of the foregoing, we hold the court's restriction was an appropriate condition imposed necessary for the safety of the parties' children. 750 ILCS 5/603.10(a)(9) (West 2022). The court did not abuse its discretion in restricting Mario's parenting time by indefinitely suspending a determination on his parenting time until he undergoes a Rule 215 mental examination.

¶ 67                    C. Assigned Cost to Supplement the Record

¶ 68     Thomas filed a motion to compel Mario to supplement the report of proceedings pursuant to Illinois Supreme Court Rule 323, requesting that the record be supplemented with 11 transcripts of circuit court proceedings. Ill. S. Ct. R. 323(a) (eff. July 1, 2017). Mario objected to the motion. We entered an order on April 24, 2025, allowing the motion but noted that we were mindful that Rule 323(a) allowed that "[t]he entire expense of incorporating unnecessary and immaterial matter in the report of proceedings may be assessed *** against the party who designated that matter, irrespective of how the appeal is decided." *Id.* We have examined the supplemental record and the cites thereto in Thomas's brief and conclude the supplementation was reasonably necessary to

19

allow the reviewing court to reach its conclusions herein and was not unnecessary or immaterial to the issues presented. As such, we find no reason to assess as costs the fees associated with supplementing the record against Thomas. Such expenses shall remain the obligation of Mario.

¶ 69                                    III. CONCLUSION

¶ 70          The judgment of the circuit court of Du Page County is affirmed.

¶ 71          Affirmed.