*In re* MARRIAGE OF PETER MILOVICH, Petitioner-Appellee, and
MILDRED R. MILOVICH, Respondent-Appellant.

First District (5th Division)    No. 81-1069

Opinion filed March 31, 1982.

Douglas Polsky, Joel Ostrow, J. Scott Bonner, and Alan Rugendorf, all of Chicago, for appellant.

Joseph H. Becker, Norman Becker and Selwyn Blum, all of Chicago (Gary E. Dienstag, of counsel), for appellee.

JUSTICE WILSON delivered the opinion of the court:

This appeal is taken from the trial court's judgment which dissolved the parties' marriage, awarded custody of the two minor children to petitioner (husband), apportioned the marital property, and determined the support, maintenance and attorney fees. Respondent raises several issues

but her primary concern appears to be the custody award. In addition to alleging error with respect to custody, respondent contends that (1) the judge was biased against her and should have recused himself; (2) the court erred in refusing to allow her to substitute counsel or add four new attorneys to represent her during the trial; (3) the court awarded a disproportionate share of marital property to petitioner; and (4) the court's assessment of attorney fees against her was erroneous. Respondent further challenges the dissolution judgment as to grounds and argues that the court erred in barring her from receiving maintenance. Inasmuch as respondent waived the grounds issue and has since remarried, the question of grounds and maintenance is moot and we shall not consider it further.

Some of the facts in this case are bitterly disputed and argumentatively presented in appellant's brief. Indeed, petitioner-appellee filed a motion to strike portions of the brief for containing scurrilous material. We emphasize that we disregard irrelevant and inflammatory material in reaching our determination of the issues presented. Nevertheless, some of the comments and argument in appellant's brief are inaccurate, highly improper and far exceed the bounds of zealous advocacy. We express our disapproval to remind counsel that the first purpose of the appellate brief is to inform the court of the facts, objectively, and then to persuade the court of a particular application of the law to the facts. Our impartial review of the pending controversy, which encompasses almost 1500 pages of transcript, is not aided by the persistent inclusion of misleading statements. After sifting through the voluminous record, therefore, we summarize only those facts which are pertinent to the issues and are necessary for an understanding of this case.

On May 14, 1979, after approximately 12 years of marriage, petitioner filed a dissolution action, alleging that his wife was guilty of adultery and requesting various forms of relief. Respondent answered and counterpetitioned, denying the adultery allegations and alleging that petitioner was guilty of mental cruelty. On June 8, 1979, the court entered a temporary restraining order against both parties to prevent them from removing the children from the marital home and to prevent the dissipation or transfer of the parties' joint assets. Pursuant to an agreed order, the court directed the Department of Supportive Services to investigate and report on the home environment.

On April 21, 1980, trial began with the evidence regarding petitioner's grounds for dissolution. After petitioner rested the court ruled that he had established a *prima facie* case of adultery and that respondent could proceed with her defense and counterpetition. The court then adjourned. The hearing recommenced on May 15, 1980. At that time respondent's counsel informed the court that respondent would not interpose a defense

to grounds because she was eager to proceed to the custody and property matters.[1]

On May 16, 1980, the child custody hearing began. The court heard the testimony of 15 witnesses in six sessions over a five-month period. Petitioner's first witness was Dr. Dean Dauw, a clinical psychologist and published author with 15 years of experience in marriage counseling. He testified that he consulted with the parties 10 times between March 13 and May 8, 1976. Mrs. Milovich had told him of her wish to "better relate" to her daughter, Nicole, and her desire to have a "more effective career" than being a mother or a housewife. The doctor conducted psychological tests on the parties and concluded that respondent had certain needs which led her to be impatient with her daughter. The doctor prescribed a course of behavior for her which involved certain goals and a system of self-reward and punishment.

George Lebsock, petitioner's supervisor at the Chicago Housing Authority, next testified. He had known Peter Milovich for 20 years, at work as well as socially. He testified that on two occasions he had seen Peter display a concerned, responsive attitude toward the two Milovich children and that they also responded well to their father.

Dmitor Rakich, president of the congregation of petitioner's church, testified that he had known Peter for 30-35 years, through church activities. He testified that petitioner attended church regularly and brought the children to Sunday School. He thought that Peter exhibited more "warmth" toward them than had Mrs. Milovich. He stated his opinion that Mr. Milovich was the more responsible parent, although he admitted that he had only observed the mother 3-5 years ago for a few minutes during infrequent church social functions.

Mary Ann Anderson, the parties' neighbor for seven years, testified that she saw the parties regularly and had bowled with Mrs. Milovich. She had let the daughter, Nicole, come over to her house on occasional mornings to wait for the school bus when Mrs. Milovich was gone. She further testified that the children always appeared healthy, groomed, and happy. She had observed both parents with the children on different occasions.

Another neighbor and a friend of the parties, Mariangela Castrogiovanni, testified that she had seen both parents interact with their children. She related that Mrs. Milovich had told her that she would not have children if she had her life to live over again. Since the dissolution proceedings began, Mrs. Milovich had not socialized with any of the neighbors.

The next two witnesses were Mr. Milovich's niece and her 19-year-

---

[1] We strongly disapprove of the statement in respondent's appellate brief that "Judge Grupp imposed upon the wife and her attorney to waive a defense to grounds ° ° °." The record clearly establishes otherwise.

old friend. The friend described a ski trip that Mr. Milovich had taken the children on and stated that he was affectionate toward them. She further testified that she observed Mrs. Milovich kick her husband on March 3, 1980.

Peter Milovich's niece babysat for the children every other week from 1972-1977. On occasion she saw both parties discipline the children. The father spanked them and the mother sometimes dug her fingernails into their arms. She saw the mother kiss the children on the tops of their heads only. The children were more "physical" with their father, who played with them. In the niece's opinion, he was affectionate toward them but Mrs. Milovich was not.

Petitioner's sister, Sorka Lester, testified that she had enjoyed a good relationship with her brother's wife for several years but that they had not been on friendly terms for the last few years. She had talked to respondent approximately 6 months before the parties' marriage. At that time respondent expressed her feeling that she did not want to have children. Ms. Lester further testified that her brother would always check on the children when the families visited but that her sister-in-law rarely did so. She saw her brother help his children with their homework. On March 3, 1980, she observed respondent kick her brother and slam the door behind him.

Petitioner then called respondent to testify pursuant to section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60). She testified that she was presently living with her husband and children in a nine-room house in Palos Heights. There is a lock on her bedroom door for privacy. She works as a sales representative and until recently she was out of town for periods of several days, which totalled two weeks out of each month. When she was gone, Mr. Milovich took care of the children. She admitted that she had been found in contempt of court for violating the visitation order but stated that she had taken the children out of town on some of "his" weekends because he had not paid the support money and she believed that "one negated the other."

Regarding her conversations with Dr. Dauw, the psychologist, she stated that she had been having difficulties understanding Nicole during that period because she was confined to the house all day without adult company. Her relationship with the neighbors was somewhat distant because she felt they were critical of her. When she went bowling once a week, she took the children with her. She occasionally worked as a substitute teacher and modelled a few times. Respondent further testified that she may have told others that she was unhappy being pregnant but that if she did not want to have children she would not have. Mrs. Milovich further stated that her husband was "all right" as a father and that he enjoyed a good relationship with the children. She testified that

she had flexible hours as a sales representative, working five days a week from approximately 8:30-4:30. She would leave Jason at a day-care center in the morning and generally pick him up after work. She also stated that she would prefer not to work if she had the choice but that she needed the money.

When the hearing recommenced on October 15, 1980, approximately two months after Mrs. Milovich had testified, the court heard her motion for leave to add additional counsel. Petitioner objected because he had been given no prior notice and because the motion came in the middle of trial. The court denied respondent's motion. Then petitioner's counsel, Mr. Blum, objected to the addition of Dr. Reuben Siegal to respondent's witness list. The children's attorney, Mr. Schultz, joined in the motion on the grounds that there was no issue regarding the parties' mental health. The court granted the motion to exclude Dr. Siegal as a witness.

Petitioner then testified on his own behalf. He had been employed by the Chicago Housing Authority for 20 years. He related an incident in which he had to break a chain on the door to get into the house because his wife was sleeping and the baby was crying. He further testified that his wife had been very upset after the birth of Nicole and, in the delivery room, screamed that she did not want the baby and hoped it was dead. He stated that he helped his wife feed the baby and change her diapers. He also described several incidents when Nicole or Jason were ill and he had taken care of them, even missing a day of work in one instance. He further testified that in 1976 his wife consulted with Dr. Dauw because of her trouble relating to the children. She often stated that she wanted to be "free."

After the dissolution proceedings began the parties' relationship deteriorated rapidly. They both continued to live in the marital home with Nicole and Jason. Petitioner testified that one night in June of 1979 he was prevented from eating with his family because his wife refused to set him a place and then threw his food out and called him a name. The next day when he again tried to eat with them she said she would poison him. These actions and threats, he testified, upset the children and made them cry. He stopped eating with the family after that. In January of 1980, his wife put a bolt on the door of the master bedroom. The nursery adjoined the bedroom and was only accessible through that door. When he arrived home from work the children would be herded up into the bedroom and he would be denied access to them except for the weekends that he had visitation rights.

Petitioner further testified that his wife's employment required her to be out of town approximately 73 days total, from January to September, 1980. His job never required him to travel out of Chicago and in an emergency he could go home. Finally, petitioner testified that his wife did

not demonstrate affection toward the children and told them not to "mess up" her hair or dress. He, on the other hand, would hold them, carry them, and kiss and hug them.

After petitioner rested, respondent called as her first witness, her sister, Sally Ann Radick, a Pennsylvania attorney. She related that she had observed Mrs. Milovich on several occasions playing with the children and also observed affection between them and their mother.

A college student who works at the neighborhood pool next testified that he saw Mrs. Milovich bring the children there 2-3 times a week during 1980 and about once every two weeks during the summer of 1979. He never saw Mr. Milovich bring them.

Wayne Basch, associate pastor of a church, testified that he knew Mrs. Milovich from her work as a Brownie Scout leader. He also saw her occasionally at church services. He saw Jason and his mother when she dropped him off and picked him up at the day-care center located by the church. The pastor observed that the mother and son appeared to be close and responsive to each other. He had never met Mr. Milovich.

Respondent's mother, Mildred Radick, testified that she had taken care of the children at her daughter's request, approximately six times between January and May of 1980 when Mrs. Milovich was out of town on business. She stayed in the Milovich home with the children and Mr. Milovich for periods ranging from one to five days at a time. During her stays she would do the cooking and cleaning also. Mrs. Radick also testified that on occasions that she visited her daughter and son-in-law, her daughter was always the one who cooked and cleaned for the family. She had never seen Mr. Milovich help.

Mrs. Milovich testified on her own behalf. She is a technical representative and local salesperson for Perma Alloys. Presently, her job only requires her to travel during the day although prior to September 1980 she had to make overnight trips. In 1980 she was gone for a total of 56 days.

When she was in the recovery room following Nicole's birth she was groggy and tired. She testified that she did not ever reject having the baby in the room with her. She took care of the baby and all of the household chores. When Jason was born, she fed him most of the time, but Mr. Milovich sometimes gave him the midnight feeding. He would not change diapers but occasionally bathed Nicole.

Mrs. Milovich further testified that she was a Brownie Scout troop leader for 4 years, a Sunday School teacher for 3 years and took the children to church. She arranged and paid for Jason's day care, and took the children to their lessons and activities. Her husband rarely attended any recitals, plays, or special functions with or for the children. He did attend Indian Guides, a father-son activity, with Jason. In January of 1976 he was hospitalized for 4 days in the intensive care unit.

At the conclusion of this testimony the children were interviewed in chambers by the court with all counsel present. The judge told the children several times that they should not blame either parent but if they wanted to blame someone they should blame him. Nicole stated that she knew what it meant to tell the truth; she got along with Jason; she knew both parents loved her; she played games with both parents; both helped her with school work; and both parents were "fun." Jason also stated that he loved both parents and had fun with both of them. Nicole testified that she was told to "tell the truth" and that no one told her what to say. Jason said his dad would spank him if he were bad and his mom spanked him once with a leather belt. Nicole said her mom never spanked her but Jason said, "She bites your hair and pulls your hair." Nicole and Jason again stated that they had fun with both parents. The court sustained an objection to the children's counsel's question as to Nicole's preference of parents. When asked if there was anything else Nicole wanted to say that no one had asked, she replied, "No."

A caseworker for the Department of Supportive Services, Edlynne Sillman, testified regarding her assignment to the Milovich case. She had participated in 150 other investigations. She testified that she visited the Milovich home on September 11, 1979. At that time she interviewed both parties and the children. In addition, she spoke to several references over the telephone. She testified that the children appeared well-adjusted, relaxed, and comfortable with both parents, and that the parties were affectionate and spontaneous with the children. Mrs. Milovich had been home until May of 1979, when she found employment as a salesperson. Her hours were flexible and she usually left after the children were taken care of in the morning and returned by 4 p.m. Mr. Milovich's schedule was to leave for work at 7:30 a.m. and return home at about 6 p.m. She further testified that, in her conversation with petitioner, she learned that respondent had taken care of all domestic chores when she was home and that she still did all of the housework in addition to her job. Mr. Milovich further told Ms. Sillman that he could learn to take care of the house or hire a housekeeper if he had custody of the children. The caseworker was not allowed to give her opinion as to whom the custodial parent should be, or relate the substance of her conversations with anyone other than the parties.

The parties proceeded with closing arguments as to custody. Donald Schultz, the children's attorney, stated that both parents were decent people and their children, "extraordinary." He concluded, however, that since Nicole was reaching puberty, it was in her best interest to be in her mother's custody and that the two children should not be separated.

The court then ruled that after considering all of the relevant factors

under section 602 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 602), and all of the evidence, it would be in the best interests of the children to be placed in their father's custody. The judge stated that he had considered the wishes of the children and parents, the children's adjustment to home, school and community, and that he did not consider any conduct of either parent that did not affect their relationship with the children. He noted that Mrs. Milovich is entitled to pursue her own career, but that the children were entitled to a stable environment. In a written order of October 28, 1980, the court reiterated and elaborated on its findings, concluding that Peter Milovich was better able to provide a stable environment. The court thus awarded him custody, with liberal visitation to the mother.

On October 24, 1980, four additional attorneys for respondent appeared in court, Messrs. Douglas Polsky, Joel S. Ostrow, J. Scott Bonner, and Alan Rugendorf. Robert Karton, who had only the previous day received notice of their petition for leave to appear, then asked the court for leave to withdraw as respondent's counsel and to substitute the four new attorneys. Petitioner's counsel objected and the matter was continued. On November 10, 1980, the court heard argument of counsel and allowed Mrs. Milovich to testify. She stated her preference for the new attorneys and her refusal to pay Karton for any services on her behalf after the date of the hearing in substitution of attorneys. She also stated that she lost faith in him after the hearing on the grounds for dissolution. The trial court then denied her petition, noting that although a client may certainly discharge her attorney before trial, when the issues are joined and the matter goes to trial the court in its discretion may deny the substitution or addition of attorneys.

Subsequently, Karton repeatedly asked the court to reconsider his motion to withdraw as counsel for respondent because she refused to cooperate with him in any way. The court denied all motions for substitution or withdrawal of respondent's attorneys.

On December 4, 1980, the court heard Mrs. Milovich's *pro se* petition asking the judge to recuse himself for being biased against her. Karton unequivocally disassociated himself from the contents and allegations of the petition. Mrs. Milovich first told the judge to swear himself in as a witness to answer her 96 questions. After considerable objections, argument and discussion as to the procedure to be followed, the court allowed Karton to read the questions while Mrs. Milovich responded. Many objections to various questions were sustained. The court ultimately denied her petition, holding that it failed to state a cause of action for recusal, was frivolous and without merit.

Following further battles over visitation rights and which parent

should have the children over the Christmas holidays, the remaining issues were heard, in March 1981. The evidence regarding the property disposition and attorney fees will be summarized in the analysis of those issues.

On March 5, 1981, the judge again interviewed the children, at the request of their attorney, to help determine the best visitation arrangement. By this time the custody determination was five months old and the parties were still living together in the same household. Jason, then a first grader, told the judge he was doing well in school and getting along with both parents but that they were "bad to each other." He further stated that he and Nicole no longer got along with each other. He appeared to be satisfied with the visitation schedule that provided for each parent to have the children on alternate weekends. He went to bed at 10 p.m.

Petitioner told the court that he heard Alan Rugendorf tell Nicole, just prior to her interview by the court, to "be sure you say no one told you what to say." The children's attorney, Donald Schultz agreed that "a certain amount of the tension in that home comes from these intruders [attorneys] Rugendorf and Polsky." Nicole told the court that she wanted to be with her mother as much as possible. At first she did not care who she was with but had since decided that she could not stand being with her father because he had been hitting her. They had arguments during which she refused to do what he told her to do. Nicole felt sorry for her mother for having lost the custody determination. She also told the judge that she blamed him, as he had told her.

On March 13, 1981, just before closing arguments, petitioner's counsel presented an emergency petition to bar Mrs. Milovich from entering the marital home because she had allegedly removed items from the home and ordered a moving van to take away furniture. When petitioner sent the movers away respondent threw printer's ink on the living room furniture. The court entered a rule to show cause and on March 16, 1981, respondent voluntarily moved out of the home. The court also enjoined her from removing household effects.

On March 27, 1981, Joel Ostrow appeared in court on respondent's behalf ostensibly because he believed that the court had discharged Karton following the court's oral judgment. He offered a petition that alleged that Mr. Milovich had physically and emotionally harassed his ex-wife and Nicole. The relief requested was a rule to show cause and a re-opening of the custody determination. Petitioner's counsel objected on the basis that Ostrow lacked standing because Karton was still attorney of record until the dissolution judgment was entered. The court allowed him to file the petition and granted petitioner's counsel leave to file a response. There is no further indication in the record as to the disposition of this matter.

The final judgment dissolving the marriage and determining all at-

tendant issues was entered on April 7, 1981, and notice of appeal was filed thereafter.

OPINION

I

Respondent first contends that the trial court erred in awarding custody of the children to their father. She argues that the custody award is against the manifest weight of the evidence. Further, she maintains that the court erroneously excluded (1) the expert opinion of Ms. Sillman, the court-appointed social worker; (2) the testimony of Dr. Siegal, a psychologist; and (3) the parental preference of Nicole. Finally, respondent contends that the court failed to consider the recommendation of the children's attorney. We reject these arguments.

A.

Section 602 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 602) codifies the established guiding principle for determining custody, the child's "best interest." This section provides:

"(a) The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:

(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community;

(5) the mental and physical health of all individuals involved; and

(6) the physicial violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person but witnessed by the child.

(b) The court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child."

■■ The trial judge must exercise his judgment in resolving the often difficult custody dispute. It is not necessary to find one parent "unfit" to justify an award to the other parent. Nor do Illinois courts any longer presume that the mother is necessarily the better custodian for young children. (See *In re Marriage of Sieck* (1979), 78 Ill. App. 3d 204, 396 N.E.2d 1214; *Jines v. Jines* (1978), 63 Ill. App. 3d 564, 380 N.E.2d 440.) Instead, the judge must evaluate all of the circumstances and appraise the witnesses' credibility. Consequently, the reviewing court will not overturn

the trial court's determination unless the judgment is against the manifest weight of the evidence or is manifestly unjust. *E.g., In re Marriage of Sieck; Strand v. Strand* (1976), 41 Ill. App. 3d 651, 355 N.E.2d 47.

In the pending case, the trial judge heard lengthy testimony from the parties and their witnesses and also interviewed the children on two occasions. The father's witnesses related incidents when they observed his affectionate relationship with the children. He played with the children, helped Nicole with homework, and was physically affectionate. Both children told the judge that they loved and had fun with both parents. Respondent admitted that the children and their father enjoyed a good relationship. Further, he had had a stable job for 20 years and testified that he would be able to leave work if a problem or emergency arose concerning the children. Finally, there was no evidence whatsoever during the custody proceeding to indicate that Mr. Milovich was violent or abusive toward the children. Because of serious accusations against him contained in respondent's brief, however, we will discuss certain matters arising toward the end of all the proceedings, several months after custody was determined.

■ Respondent argues that Mr. Milovich has beaten Nicole and threatened her since the October 28, 1980, custody award in favor of the father. She alleges that he was under investigation for criminal child abuse, but fails to add that he was completely cleared by the Department of Family Services, which is charged by law with investigating reports of child abuse or neglect. Respondent's brief also alleges incidents of Mr. Milovich's abusive behavior. There is nothing in the record to substantiate the allegations, which are derived from the petition respondent filed on March 27, 1981, just before the final written judgment was entered. These allegations apparently arose out of the incident in which Mrs. Milovich tried to remove certain items from the house and threw printer's ink on the living room furniture. A bare allegation of abusive behavior, of course, is not evidence, and we cannot accord it any weight. Finally, while Nicole did tell the judge during the March 5, 1981, interview that the father was "hitting" her, at that time the parents were still living together in what undoubtedly was a tension-filled environment with the children caught in the middle of the parent's battles. Nicole's statements in this second interview also indicated that part of the problem was her failure to obey her father. We conclude that the record contains no persuasive evidence that Mr. Milovich was violent or abusive toward the children. We find that the evidence clearly supports the trial court's inference that Mr. Milovich is a fit custodian for the children.

■ Regarding the mother's evidence, we recognize that much of it indicates that she also is a good parent. She took the children to their lessons

and activities and had primary responsibility for household chores, even after taking a full-time job. The job has flexible hours and no longer requires her to travel out of town overnight. Other evidence, however, indicates that she attempted to keep the children away from their father while the parties lived together during the proceedings and that she refused to allow him to eat with the family. While there is no question that both parties love their children, that is not the crucial issue here. A custody determination does not require a showing that one parent is a "better" or "worse" person than the other; it is the children's best interest that is paramount. In this context, much of the testimony in the pending case has limited value standing alone. For example, that Mrs. Milovich expressed a desire not to have children before or even after having them has little bearing on her present suitability as a parent. Similarly, Mr. Milovich's disinterest in changing diapers and cleaning house does not mean that he is not a proper father. It was for the trial court to weigh the witnesses' testimony, much of which, as we have noted, was rather mundane; neither parent emerges as a monster or a saint. Nevertheless, the trial court observed the parties and witnesses and determined that the father could provide a more stable environment for the children. After our careful scrutiny of the record we conclude that there is nothing to indicate that this judgment is "manifestly unjust" or against the manifest weight of the evidence.

## B.

Regarding the three instances in which the trial court allegedly erred in excluding certain evidence, we initially note that respondent failed to make offers of proof for the record. Without such offers, the reviewing court cannot ascertain the nature and significance of the excluded testimony. Although these arguments are thus technically waived, we will briefly discuss them because of the importance of the child custody determination.

First, respondent argues that the court-approved social worker, Ms. Sillman, should have been permitted to express her "expert" opinion as to which parent should have custody. Ms. Sillman, employed by the Department of Supportive Services, conducted an investigation into the children's environment. She interviewed the parties in their home and talked to references over the telephone. During her testimony the court sustained petitioner's objection when respondent's counsel asked for her opinion as to which parent should have custody. The basis of the objection was that she had not been qualified as an expert and that respondent's counsel had not established an adequate foundation, based on her observations, for her opinion on custody. Respondent's counsel then

withdrew his question as to her qualifications and did not again ask for her opinion.

■■ Under the circumstances, we do not find that the court erred. The question of an expert's qualification to give an opinion largely depends on whether the witness discloses sufficient knowledge of the subject matter; this determination of qualification rests within the trial court's discretion. (*In re Custody of Baty* (1980), 83 Ill. App. 3d 113, 403 N.E.2d 747.) The record reveals that Ms. Sillman had a degree in art education and had worked as a teacher before working for the Department of Supportive Services. She had worked for the Department for 1½ years and had conducted approximately 150 investigations. She testified as to her personal observations of the family for one day.

■■ We need not decide whether her experience with the Department gives her expert status regarding custody matters. Even assuming her to be an expert, however, the trial court clearly would not be bound by her opinion because custody is a judicial determination. Moreover, the court heard testimony concerning her investigation and could properly evaluate that testimony without requiring her opinion on the ultimate question of custody. We conclude that the court did not abuse its discretion.

■■ Similarly, we find no error with respect to the exclusion of Dr. Siegal from respondent's witness list. The record indicates that she sought to add the doctor as a witness long after discovery was closed, trial was underway, and 10 witnesses had already testified. The attorneys for petitioner and the children objected to Dr. Siegal partly on the basis of surprise and their lack of time to depose the witness. Respondent did not offer reasons why the witness had not been available earlier. Nor did she explain why it was necessary to belatedly call in another psychologist after apparently deciding not to submit testimony from the court-appointed psychologist, Dr. John Lowler. Without an offer of proof, moreover, we cannot evaluate the contents of his testimony. Finally, while the testimony of psychologists is permissible in custody cases, such testimony is not determinative of the custody issue. (See *In re Marriage of Auer* (1980), 86 Ill. App. 3d 84, 407 N.E.2d 1034; *In re Marriage of Sieck* (1979), 78 Ill. App. 3d 204, 396 N.E.2d 1214.) We therefore find that the court did not abuse its discretion in refusing to allow Dr. Siegal to testify.

■■ Respondent next posits that the trial court erred in excluding Nicole's expression of preference as to which parent she would choose for her custodian. Section 602(a)(2) of the Act lists the child's wishes as one of the relevant factors in determining custody. During the first interview with the children, petitioner's objection to the question of Nicole's preference was sustained by the court. We are aware of no case, however, which holds that the court must allow or require a child to expressly make a choice. In fact, it does not appear that the court is even required to

interview the children in every case; section 604(a) provides that the court *may* interview the child in chambers to ascertain his wishes. (See *Thomas v. Thomas* (1978), 56 Ill. App. 3d 806, 372 N.E.2d 679; *DeYoung v. DeYoung* (1978), 62 Ill. App. 3d 837, 379 N.E.2d 396.) Moreover, the scope of questioning in such an interview is largely a matter of the judge's discretion; he is not limited to asking what the children expressly prefer but may determine this from their answers to other questions, their personality, and other circumstances. See *In re Marriage of Ford* (1980), 91 Ill. App. 3d 1066, 415 N.E.2d 546.

In the pending case the children were asked questions regarding their feelings toward their parents. The answers they gave support the court's ultimate determination. Both children indicated in the first interview with the judge that they loved their parents equally and had fun with both of them. It is doubtful that Nicole would have been able to make an unequivocal choice at that time. Moreover, it may well have been harmful to put her in that position because of the possibility that she would feel disloyal to the other parent. Furthermore, Nicole was given the opportunity to discuss anything that no one had asked her; she had nothing to add. At the conclusion of this interview with the children the judge stated that there was sufficient information for him to determine the children's preference.

■■ Five months after the initial custody adjudication the court again interviewed the children. During those months they had been subjected to the tense home environment caused by their parents' marital problems, which were aggravated by the fact that they all resided under one roof. It was during this interview that Nicole for the first time expressed her desire to be with her mother. She admitted that she did not care at first but that she no longer got along with her father and felt sorry that her mother had lost custody. Respondent did not, however, then petition the court to change or reconsider custody. Indeed, respondent's implication that the judge totally disregarded Nicole's preference is unfounded.[2] The judge's memorandum opinion expressly states that he considered the children's wishes but that their preferences were not controlling. He also stated that "[t]he daughter, Nicole, is 12 years old and the son, Jason, is 6 years old. The court determines that although the children are bright, the confused and unsettled living conditions at home adds to their lack of maturity to choose what is in their best interests and welfare or what is least harmful to them." The judge, in so stating, recognized the principle that his duty was to determine what was in the children's best interest

---

[2] Again, respondent's counsel in the brief oversteps the bounds of propriety by charging that the judge "sought to conceal his departure from the law by reciting that he had considered the child's wishes. This is a damn lie." Such characterization of the court's decision is repugnant.

even if the children disagreed; the child's expression of preference is not binding on the court. (*Patton v. Armstrong* (1974), 16 Ill. App. 3d 881, 307 N.E.2d 178.) We conclude that the court did not fail in its duty to consider the children's preference in its determination. See *In re Marriage of Padiak* (1981), 101 Ill. App. 3d 306, 427 N.E.2d 1372.

Respondent further contends that the trial court erred in failing to consider the custody recommendation of Donald Schultz, the children's attorney. Respondent asserts that he "clearly" favored the mother. The record, however, establishes that he told the judge that he felt both parents were "decent" and that the children were extraordinary. He admitted that the children would probably be "well off with either parent," but recommended that Nicole should be placed in her mother's custody because she was reaching puberty. He also felt that Jason and Nicole should not be separated.

■ In *In re Custody of Blonsky* (1980), 84 Ill. App. 3d 810, 405 N.E.2d 1112, we affirmed the trial court's decision to award the father custody despite the recommendation of the children's attorney that they be placed with the mother. We rejected the argument that the court's decision proved that it completely ignored the recommendation of the children's attorney. As in the present case, the attorney's recommendation in *Blonsky* was couched in equivocal terms. Schultz conceded that the father was fit and the children would fare well with either. Moreover, his basis for recommending the mother, Nicole's impending puberty, is a relevant but not conclusive reason to award custody to the mother. Also of some significance, Schultz did not recommend that custody should be changed or reconsidered at any time following the court's memorandum decision on custody.

■■ Finally, we summarily reject respondent's allegation that the trial judge improperly considered the grounds for dissolution, her adultery, in the custody adjudication. The judge explicitly stated that he did not consider conduct of either party that did not affect his or her relationship with the children and we will not presume otherwise. Contrary to respondent's attorney's insinuation, there is absolutely no evidence of record that the court precluded respondent from proceeding with a defense to the grounds or with her counterpetition. Counsel apparently uses this type of unfounded argument to bolster his more serious allegations, also unsupported, that the judge appeared on the "Today Show" and stated that he could not help but consider respondent's adultery in making the custody determination. We would not discuss such bare allegations any further except that respondent's next contention is that the judge should have recused himself because of his supposed bias against respondent.

## II

Respondent theorizes that the judge in the pending cause allowed his personal and political interests to become adverse to the wife's interests because his custody ruling was publicized in newspapers, television, and radio. According to respondent, his decision was highly criticized by the media and, as a result, he was subjected to adverse publicity just before the judicial retention election in which he was up for consideration. Respondent takes the position that after he won retention the judge "punished" the wife by his subsequent rulings.

Several comments are necessary. First, and most obvious, we cannot consider matters not of record. Nor do we have authority to take judicial notice of the contents of the "Today Show" or other television programs. The only pleadings or papers in the record which involve the judge's supposed remarks to the news media is Mrs. Milovich's *pro se* petition for the judge's recusal.[3] This matter arose after she had lost custody and was attempting to substitute or add the attorneys who are now her appellate counsel. In her brief she makes the statement that an article "highly critical" of the judge's ruling appeared in the Chicago Sun-Times on October 23, 1980. Also, she discussed an October 29, 1980, article which supposedly reports on a "nose-to-nose" interview in which the judge explained his decision against the mother in part by noting that she gave no defense when her husband sued for divorce on the grounds of adultery. The implication that respondent's counsel would have us draw is that the judge's conduct deprived her of a fair hearing.

A reading of the above-mentioned Sun-Times articles (attached to Mrs. Milovich's petition), however, belies counsels' argument. The first article reports on the court's oral decision of October 20, 1980, and then quotes Mrs. Milovich's viewpoint that she lost custody because she had a job and that the decision "set women 'back by three generations.' " The article noted that Mr. Milovich could not be reached for comment and then concluded with the judge's statement that he was concerned primarily with the good of the children in making the award and that Mrs. Milovich's job was not the controlling factor in his decision. The second article is not, as respondent's counsel implies, a face-to-face interview with the judge. Rather, it is a follow-up report that quotes from the judge's written memorandum opinion of October 28, 1980, which sets out his findings. The opinion's reference to Mrs. Milovich's adultery was in the context of the court's judgment on grounds for dissolution, *not* child custody. The fact that she did not offer a defense, thus, is noted as part of

---

[3] The petition has no affidavit attached. It contains a jurat and the signature of Douglas Polsky as notary public.

the dissolution issue; the court merely found that there was a sufficient showing of grounds. As the facts of this case indicate, her failure to contest grounds was based on the parties' desire to dissolve the marriage and to expedite the custody determination.

We conclude that there is no foundation for the allegations of judicial impropriety in this case.[4]

### III

Respondent next contends that the court erred in refusing to allow her to add or substitute attorneys. The first time a motion was presented to add counsel was October 15, 1980, when Alan Rugendorf sought leave to appear as additional counsel. At this time the hearing on grounds was over and the custody proceedings were well underway. Ten witnesses had already testified. No notice had been given to petitioner's attorney or the children's attorney, both of whom objected to Rugendorf's appearance. The court denied the motion and the custody hearing was concluded.

Thereafter, several other motions to add or substitute attorneys were presented and denied. On October 24, 1980, again without advance notice, Alan Rugendorf and three other attorneys asked the court for leave to substitute as respondent's attorneys. Robert Karton, her attorney of record, requested leave to withdraw. This matter was continued, and the court entered the judgment of dissolution and child custody.

On November 10, 1980, a hearing on respondent's motion was held. She testified that she had lost faith in Karton, believed him to be incompetent, and refused to pay him any further fees. She did not explain why she needed four attorneys. The attorneys for petitioner and the children strongly objected to the motion, citing the disruptive impact that four new attorneys would have on the remaining proceedings. The four attorneys denied that there would be any delay in the trial on the remaining issues. The court denied the motion.

On November 21, 1980, the court denied Karton's motion to reconsider its refusal to allow him to withdraw.

Respondent's appellate counsel (the same four attorneys who sought substitution) then filed notice of appeal from the October 28, 1980, judgment of dissolution and child custody.[5] The proceedings in the trial court

---

[4] We are impelled to again remind counsel that our time is not well spent in addressing spurious issues. Nor are we impressed with distorted presentations of the facts and disparaging remarks about the trial judge and petitioner. Even more troublesome, perhaps, is the inclusion in respondent's brief of vague but serious innuendo. For example, counsel hints at an "investigation by the Illinois Court's Commission," in one sentence without any explanation. In another instance, counsel intimates that petitioner's income was supplemented by "kickbacks!" Apparently, counsel believes this brand of off-record rhetoric is persuasive; we emphatically disagree.

[5] On January 2, 1981, the appeal was dismissed because the October 28 order was nonfinal.

continued, however, and on December 4, 1980, Mrs. Milovich presented her *pro se* petition for the judge's recusal and for a mistrial. Karton appeared on her behalf to protect her interests; however, he disassociated himself from the contents of the petition because he believed that the allegations were "grossly erroneous."

On January 21, 1981, while Judge Grupp was in the hospital, Karton presented his motion to withdraw before another judge. The trial date on the remaining issues was set for March 4, 1981. Karton's motion was continued before Judge Grupp.

On February 20, 1981, respondent once more attempted to bring the four attorneys into the case by appearing before the presiding judge. He directed her to present the motion before Judge Grupp.

On March 4, 1981, Judge Grupp denied respondent's motion to add (rather than substitute) the four attorneys and the remaining issues were heard.

Respondent now argues that the trial court's action constitutes "the world's most compelling case of a judge's abuse of discretion," and maintains that she had an unconditional right to discharge Attorney Karton. We disagree.

■■ ■ The Illinois Supreme Court, in a criminal case, has recognized that a party's established right to discharge or substitute attorneys is not "so absolute that its exercise may not be denied where it will unduly prejudice the other party or interfere with the administration of justice." (*People v. Franklin* (1953), 415 Ill. 514, 516-17, 114 N.E.2d 661, 663.) The trial court has discretion to deny a motion for substitution of attorneys but should consider whether the party seeking substitution would be prejudiced thereby. (*Filko v. Filko* (1970), 127 Ill. App. 2d 10, 262 N.E.2d 88.) Also, the movant must show some valid reason for substitution, such as the original attorney's misconduct, when the motion is made during trial. (*Filko.*) To allow a litigant an unlimited right of substitution might encourage abuse of the right; it could be used as a dilatory tactic or a means to disrupt an ongoing trial. (See *People v. Franklin; Ruskin v. Rodgers* (1979), 79 Ill. App. 3d 941, 399 N.E.2d 623.) In *Ruskin* we affirmed the trial court's denial of defendant's motion to change attorneys during the first witness' cross-examination. We noted that allowing a substitution of attorneys then "would have been extremely disruptive * * * and would have resulted in a significant and prejudicial delay. This is particularly true where, as here, the impetus behind the discharge of the attorney appeared to be predicated upon emotional whim rather than upon any apparent sound reason." 79 Ill. App. 3d 941, 955.

Respondent focusses on her right to be represented by counsel of choice and the fact that her new counsel were prepared to proceed without any delay. She also points out that the trial on the property issues did not occur until five months after the attorneys first sought substitu-

tion. Hence, she argues, there would have been no delay in trial or prejudice to petitioner.

■■ Under the circumstances of this case, however, we do not believe that the trial court abused its discretion. Perhaps the most striking fact involved in this issue is respondent's unexplained need, midtrial, for four attorneys from separate law firms. Even though respondent asserts that they were prepared to proceed without continuances or delays, it would appear likely that some disruption of the proceedings would inhere from the very logistics involved in such "multiple" representation. Not surprisingly, the attorneys for both the petitioner and the children objected to the addition or substitution of the new attorneys because they would have had to assume the burden of dealing with four separate attorneys from four different firms in place of the one man who had been involved in the case throughout the hearing on grounds and custody. It is disingenuous to argue that a party has an absolute right to change attorneys or add them at will, especially after a substantial portion of the controversy has been resolved and other, related matters remain. Moreover, respondent's attempt to discharge Robert Karton was not apparently based on a valid reason within the meaning of the *Filko* case. She said he was "incompetent" but the record does not bear this out. On the contrary, he conducted rigorous examination of witnesses and made motions and objections, even after she purportedly discharged him in open court. He tried to withdraw because of her refusal to communicate with him after that but he nevertheless continued to vigorously represent her, even during the hearing on her *pro se* petition that he did not find meritorious. Her other reason for firing him was that she lost faith in his ability to effectively represent her when she "lost" the hearing on grounds. We note that she had withdrawn her defense and counterpetition on grounds in order to expedite the custody determination and apparently was not unsatisfied with his representation until after she was losing custody and the other four attorneys became involved. While a party *initially* has great latitude in selecting and discharging an attorney, even without cause, [6] we agree with the *Filko* case's statement that a valid reason is necessary after trial has commenced. As was the case in *Ruskin*, we believe that "the impetus behind the discharge" of Attorney Karton was based upon "emotional whim rather than upon any apparent sound reason." Finally, we fail to see how Mrs. Milovich sustained any prejudice by the denial of her motions to substitute or add attorneys. In fact, the record indicates that some or all of the four attorneys were present in the courtroom on numerous occasions and attempted to communicate with her at times in court. Karton also

---

[6] Mrs. Milovich had previously been granted leave to substitute Robert Karton for her original attorney.

testified during the hearing on attorney fees that although he was sole counsel of record, he had conferred with "associate counsel" on several occasions.

We conclude that the trial court did not abuse its discretion in refusing to allow respondent to substitute or add counsel.

## IV

The final issue before us involves the distribution of the parties' marital property and the allocation of attorney fees.

### A.

Respondent argues that the trial court awarded a disproportionate share of marital property to the husband and thus violated section 503(c) of the Act. (Ill. Rev. Stat. 1979, ch. 40, par. 503(c).) This section sets out 10 factors for the court to consider in dividing the marital property between the parties.

The marital property was found to include the following items:

| | | | |
|---|---|---|---|
| 1. | Equity in marital home | $102,000.00 | |
| 2. | Pension fund | 25,080.49 | |
| 3. | Stocks | 15,053.00 | |
| 4. | Bonds | 5,800.00 | |
| 5. | Investment Club | 2,171.67 | |
| 6. | Ford Pinto | 800.00 | (disputed valuation) |
| 7. | Lincoln Continental | 4,000.00 | (disputed valuation) |
| | Total Value: | $154,905.16 | |

Mrs. Milovich was awarded one-half of the stocks, bonds, and investment fund; one-half of the equity in the marital home; the Pinto and one room of furniture. Petitioner was awarded the other 50% interests as well as his pension fund and the Lincoln Continental. Both parties kept their personal property and were barred from maintenance. Mr. Milovich, as custodian of the children, was awarded possession of the marital home and all of the furnishings except the specific items awarded to respondent. The judgment provides for the marital home to be sold when the younger child attains majority, petitioner remarries, or the home is sooner sold. Upon the occurrence of one of those events and the house is sold, the parties shall divide the net proceeds equally, after petitioner is reimbursed for his monthly mortgage payments.[7] Petitioner is also charged with the children's medical expenses and insurance. Respondent must pay weekly child support of $15 per child.

---

[7] Contrary to respondent's statement in her brief, her 50% interest in the marital home is not fixed at the present value of the net equity.

The record further reveals that there was some dispute over certain items that respondent removed from the marital home. She claimed that she took the silver because it was a gift to her from her mother and therefore, nonmarital property. Other items she took actually belonged to her sister and were being stored in the home. Petitioner's valuation of those items respondent removed is $40,000, a figure that apparently represents replacement cost.

■■ ■ Our role in reviewing the apportionment of marital property is limited to determining whether the court considered the evidence and employed conscientious judgment. (*In re Marriage of Stribling* (1981), 96 Ill. App. 3d 317, 421 N.E.2d 403.) As another way of stating the standard, we have recognized that "discretion is abused only where no reasonable man would take the view adopted by the trial court." (*In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 1127, 398 N.E.2d 126, 129.) Applying this principle to the pending case, we hold that the trial court's award was not an abuse of discretion. The critical inquiry is not who received the more expensive car or whether the items taken from the home were valued properly. Rather, we determine if the court fairly considered the relevant factors of section 503(c), including the importance of allowing the children and their custodial parent to remain in the marital home. Most of the parties' marital assets were divided equally, which does not appear to be improper. We therefore affirm the trial court's apportionment of the marital property.

## B.

Respondent last contends that the assessment of attorney fees against her is excessive and that she cannot pay them. The court ordered her to pay one-half of the fees incurred by the children's attorney and $5,000 of the $7,000 awarded to her own attorney, for a total of $8,250. Petitioner paid his own attorney, one-half of the children's attorney fees, and $2,000 of respondent's attorney fees.

■■ Generally, attorney fees are charged to the party for whom the services were rendered. (*In re Marriage of Sanborn* (1979), 78 Ill. App. 3d 146, 396 N.E.2d 1192.) It has been held, however, that in dissolution cases, the opposing party may be assessed the fees if the party seeking this relief shows "financial inability to pay and the ability of the other spouse to do so." (*Kaufman v. Kaufman* (1974), 22 Ill. App. 3d 1045, 1050, 318 N.E.2d 282, 286.) However, a party should not be required to liquidate assets or be stripped of her means of support in order to pay her fees. *Donnelley v. Donnelley* (1980), 80 Ill. App. 3d 597, 400 N.E.2d 56.

■■ In the pending case, we do not believe that respondent has established her inability to pay or that the court's allocation of the fees was an abuse of discretion. She is employed and while she earns less than

petitioner, her adjusted gross income for 1980 was $21,546.08. (His was $28,117.93.) She also was awarded 50% of the major marital assets.

As to the amount of fees awarded the attorneys in this case, we do not find the compensation unreasonable in light of the time spent and efforts expended. After reviewing the evidence pertinent to the attorney fees issued, therefore, we conclude that the trial court's award of fees, both in amount and allocation, was not unreasonable. Accordingly, there being no abuse of discretion, we affirm the court's ruling.

For the foregoing reasons, we affirm the trial court's judgment in its entirety.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.